Ram R. **BELLAM**, M.D. and
Mike Y. Tan

v.

**CLAYTON COUNTY HOSPITAL AUTHORITY, d/b/a Clayton General Hospital; John D. Maner, Ronald C. Baum, Hector H. Lopez, Jr., M.D., Orestus H. Adamson, Douglas C. Eavenson, Garry L. Garrison; Quincy K. Pierce, Earnest L. Stroud, Mary Jo Foster, Individually and as members of the Board of Trustees of Clayton County Hospital Authority; Donald B. Logan, Individually and as Administrator of Clayton General Hospital; Guy C. Davis, Jr., M.D.; Guy C. Davis, Jr., M.D., P.C., a Georgia Professional Corporation; and Riverdale Anesthesia Associates, P.C., a Georgia Professional Corporation.**

No. 1:90–cv–2247.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 20, 1990.

Alan Edward Lubel, Robert N. Meals, Jr., Dan Robert Gresham, Troutman Sanders Lockerman & Ashmore, Atlanta, Ga., for plaintiffs.

Kevin E. Grady, Helen Suzanne Smith, Alston & Bird, Atlanta, Ga., David Paul Winkle, Oliver Duckworth Sparger & Winkle, Jonesboro, Ga., Dean S. Daskal, Randall L. Hughes, Kim H. Roeder, Powell Goldstein Frazer & Murphy, Atlanta, Ga., for defendants.

**1490**

## ORDER

G. ERNEST TIDWELL, District Judge.

The above-styled matter is before the court on plaintiffs' Motion for a Preliminary Injunction.

### Factual Background

The relevant facts in this case are undisputed. Plaintiffs are anesthesiologists on the medical staff of Clayton General Hospital ("CGH"), a 365–bed acute care hospital located in Clayton County, Georgia.

Both sides acknowledge that CGH has had ongoing problems involving their anesthesiology department antedating, by a number of years, the events surrounding the present controversy. The evidence also indicates that there was an ongoing effort by the medical staff and administration of CGH and the Clayton County Hospital Authority ("Authority") to solve these problems. These efforts included the Authority's repeated encouragement to the existing anesthesiologists to develop some system that would more effectively deal with the problems the Department of Anesthesiology was experiencing.

On or about September 22, 1988, the Authority and Guy C. Davis, Jr. M.D., P.C. ("Davis P.C.") executed a contract ("Contract") pursuant to which Davis was to act as Medical Director of the Department of Anesthesiology at CGH. Prior to this time Davis was a member of the Department of Anesthesiology and Medical Director of Bioengineering at Crawford W. Long Memorial Hospital in Atlanta. The Contract provided that Davis P.C. had the exclusive right to provide anesthesiology services at CGH, "except for services provided upon request of a patient's attending physician by a physician who is not affiliated with [Davis P.C.], and who has continuously been a member of the [CGH] Medical/Dental Staff." The Contract also provided that it "may not be modified or amended except by written agreement executed by all parties." Davis assumed responsibilities under the Contract on October 1, 1988.

On October 10, 1988 there was a meeting of an Anesthesiology Ad Hoc Committee. After a discussion was held concerning the Contract, various issues were identified and resolutions were made by the committee. In attendance at this meeting were various CGH administrators, members of the Authority, surgeons, medical staff representatives, members of the Anesthesiology Department (including plaintiffs and defendant Davis), legal counsel for CGH and (Mr. Perry) legal counsel for several of the anesthesiologists. There are some differences in how the parties view the purpose and outcome of this meeting. Plaintiffs contend that the resolutions made at this meeting were meant to amend the Contract. It is agreed that no written modification to the Contract was executed and when proposed amendments were sent to Davis some time after the October meeting, his attorney responded by writing to Mr. Perry indicating that Davis did not agree to any modification of the Contract.

In March 1989, the Georgia Department of Human Resources ("GDHR") investigated CGH. In addition to noting numerous specific deficiencies related to the Anesthesiology Department in its Statement of Deficiencies, the GDHR noted that 37% of reported "incidents" at CGH between April, 1987 and September 1988, were related to anesthesiology services.

On October 1, 1989 Davis formed an anesthesiology group called Riverdale Anesthesia Associates ("RAA"). RAA contracted with Davis P.C. to provide anesthesiology services at CGH pursuant to the Contract. All but one anesthesiologist then on the staff at CGH, including both plaintiffs, were invited to join RAA prior to its formation. Plaintiffs declined the offer to join. Subsequent to the formation of RAA, in conformity with the quasi-exclusive provisions of the Contract, independent anesthesiologists, including plaintiffs, were removed from the call schedule. Thereafter, independent anesthesiologists provided anesthesiology services only when requested by the attending physician.

There were continued efforts to encourage plaintiffs to join RAA. Plaintiffs had various objections to joining RAA. One of these objections was Dr. Tan's contention

that he had cause to be concerned about the quality of care provided by members of RAA. On May 10, 1990, plaintiffs addressed the Authority to present their concerns over joining RAA. As a result of this meeting, the Authority rejected a motion to close the anesthesiology department by granting an exclusive contract but did elect to seek an independent evaluation of the department by the American Society of Anesthesiologists ("ASA").

ASA representatives conducted a site visit at CGH in June of 1990. As part of the site visit, the ASA representatives observed the Anesthesiology Department, reviewed documentation and interviewed members of the medical staff, including both plaintiffs. Although the ASA official policy is against closed anesthesiology departments, both ASA representatives personally felt that, given the problems of the Anesthesiology Department at CGH, a closed department was advisable. The ASA written report outlined problems in the Anesthesiology Department, and recommended that changes be implemented to correct these problems. The written ASA report noted the demonstrated inability of the Anesthesiology Department to function as a group over the prior four years and recommended that:

> Dr. Davis should be given the authority to carry out his mandate to organize the department of anesthesiology for the delivery of safe and effective care to patients. Although ASA opposes the use of contracts which prevent the granting of privileges to anesthesiologists who are qualified to practice in a health care institution, it seems apparent that the department of anesthesiology should be organized into a functioning unit with or without a contract.

On July 19, 1990, after review of the ASA recommendations, the Professional Committee of the Authority voted to amend the Contract to grant Davis P.C. an exclusive right to provide anesthesiology services at CGH, thereby closing the Anesthesiology Department. The Authority approved this report and resolved to implement its recommendations. Plaintiffs were notified by letter of the Authority's decision to close the Anesthesiology Department as of October 17, 1990. This letter also offered plaintiffs an opportunity to meet with the Authority before this decision was implemented.

Dr. Tan appeared before the Authority on September 13, 1990 and presented his objections to the decision to close the department. Dr. Bellam appeared, with counsel, at a meeting of the Authority on September 17, 1990. The Authority did not present witnesses at either of these meetings. On September 27, 1990, the Authority announced that it would proceed with its plan to close the Anesthesiology Department.

At various times in 1990, the plaintiffs were presented with offers to join RAA. At the request of the Authority, RAA offered plaintiffs an employment contract with RAA on October 1, 1990. Plaintiffs refused the offer and proposed alternative contract provisions. On November 2, 1990, RAA offered plaintiffs an employment contract contingent upon dismissal of the present action. This offer was also not accepted by plaintiffs.

Plaintiffs filed the present action against the Authority, Members of the Board of Trustees of the Authority, the Administrator of CGH, Guy Davis M.D., Davis P.C., and RAA, seeking injunctive relief and compensatory and punitive damages. Plaintiffs allege they are entitled to such relief due to defendants' violation of rights secured to the plaintiffs by the due process clause of the United States Constitution, Sections 1 and 2 of the Sherman Anti–Trust Act, the constitution and laws of Georgia, by contract, and by the internal rules and regulations of CGH.

*Standard of Review*

■ The standard for injunctive relief is set out in *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983). The grant or denial of a preliminary injunction is a matter within the sound discretion of the district court. Injunctive relief should be granted only if the plaintiffs clearly show: (1) a substantial likelihood that they

will ultimately prevail on the merits of the claim; (2) that they will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the plaintiffs outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. Further, "granting a preliminary injunction is the exception rather than the rule.... It is an extraordinary and drastic remedy which should not be granted unless the [plaintiffs] clearly carry the burden of persuasion" on each of the four requirements. *State of Texas v. Seatrain International, S.A.*, 518 F.2d 175, 179 (5th Cir.1975). Accordingly, the merits of plaintiffs' requested injunctive relief will be evaluated in terms of the four requirements set out above.

### Motion for Preliminary Injunction

(1) Substantial likelihood of success on the merits

### Due Process Claims

■ Plaintiffs contend that they have a liberty and property interest in the "practice of anesthesiology" such that they are protected under the due process provisions of the Fourteenth Amendment. In support of this contention, plaintiffs cite *Northeast Georgia Radiological Association, P.C. v. Tidwell*, 670 F.2d 507 (5th Cir. Unit B 1982), which held that "[m]edical staff privileges embody such a valuable property interest that notice and hearing should be held prior to its termination or withdrawal." *Id.* at 511. Plaintiffs' reliance on this case is misplaced because it is undisputed that plaintiffs' medical staff privileges have not been "terminated or withdrawn." Case law clearly supports the proposition that due process protection, if any, is significantly less when the right to perform a particular medical service is restricted in some manner, but medical staff privileges are not terminated or withdrawn. *See Faucher v. Rodziewicz*, 891 F.2d 864 (11th Cir.1990) (Holding that because plaintiff's claim amounted to merely an allegation that her medical staff privileges, while not terminated, had been reduced in economic value, there was no property interest invoking due process protection.); *Shahawy v. Harrison*, 778 F.2d 636, 643 (11th Cir. 1985), *Boucvalt v. Board of Comm'r of Hosp. Serv. Dist. No. 1*, 798 F.2d 722 (5th Cir.1986) (Holding that depriving plaintiff of a "lucrative source of income" was not equivalent to deprivation of a means of livelihood.); *Mays v. Hospital Authority of Henry County*, 582 F.Supp. 425 (N.D.Ga. 1984) (Holding that because staff privileges may be validly restricted, the plaintiff could not show a liberty interest in provision of primary radiology services.)

Plaintiffs agree that defendants conduct of closing the department was not predicated upon any allegation or finding concerning the competence of plaintiffs. (Complaint p. 22). This supports the view that, unlike a situation that calls for "Corrective Action" governed by CGH medical staff by-laws, this decision of the Authority was an administrative decision. Administrative decisions of a hospital are necessarily afforded wide latitude to effectuate the proper and efficient operation of the hospital. *See Englestad v. Virginia Municipal Hospital*, 718 F.2d 262, 269 (8th Cir.1983) (The court noted that an example of such an organizational decision is "the hospital may decide to contract with a group of pathologists, rather than one individual.").

■ If it is assumed that plaintiffs were entitled to some due process protection pursuant to the CGH by-laws, they have not shown that the due process they did receive failed to meet the minimum required by the Constitution. What is required under the due process requirement of the Constitution depends on a balancing of the interests at stake. *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir.1989). Given the long history of problems in the Anesthesiology Department of CGH, and the repeated efforts of the administration and Authority to find a solution, plaintiffs have failed to show that the process utilized was deficient. Plaintiffs were fully informed of the Authority's position, had an opportunity to appear before the Authority to present their opposition, and, most importantly, had ample opportunity to work with the admin-

istration and Authority to effectuate a solution to the problems of the Anesthesiology Department before the Authority took the action complained of.

Plaintiffs further contend that they have a protected liberty interest if they were stigmatized by the action of the defendants. In support of this contention, plaintiffs hypothesize that if there is "some implication that the decision was due to professional deficiencies," and they are "the only two anesthesiologists that have not been absorbed into Davis' group", they will be stigmatized. This conjecture is contrary to plaintiffs' own testimony and that of the Authority that plaintiffs' professional performance has never been questioned. Plaintiffs' "stigma" contention is merely conjecture, completely unsupported by the evidence and therefore irrelevant to the issues before the court at this time.

For the reasons stated above, given the evidence presented, it does not appear that plaintiffs have a substantial likelihood of success in meeting their burden of showing any deprivation of their due process rights.

*Federal Antitrust Claims*

Plaintiffs have advanced numerous antitrust arguments seeking to challenge the decision by the administration of CGH to enforce an exclusive contract with Davis P.C. For defendants' conduct to give rise to antitrust liability, plaintiffs must demonstrate that the conduct resulted from an unlawful agreement to support the conspiracy charge, 15 U.S.C. § 1, or that the hospital and Davis have market power in a properly defined antitrust market sufficient to create the possibility of a monopoly, 15 U.S.C. § 2.

 The threshold question in analyzing the antitrust implications of defendants' conduct is whether it will lessen competition. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Midwestern Waffles, Inc. v. Waffle House Inc.*, 734 F.2d 705, 721 (11th Cir.1984). Accordingly, for plaintiffs to prevail on their antitrust claims, they must show more than the mere fact that they have suffered economic injury. Rather, they must establish that they have suffered antitrust injury, *i.e.*, injury of the type the "antitrust statute was intended to forestall," as a consequence of the complained of acts. *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

 In analyzing defendants' conduct under the rule of reason, *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), plaintiffs bear the burden of proving that the conduct was unreasonable. *E.g., United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 374 n. 5, 87 S.Ct. 1856, 1863 n. 5, 18 L.Ed.2d 1249 (1967). The function of the court is to determine the market impact of the alleged restraint on competition, which, in turn, requires that the impact of the defendants' actions be assessed in a properly defined relevant market. *Id.*, 381–82, 87 S.Ct. at 1866–67. Further, to succeed in proving a restraint on competition the impact must be "substantially adverse." *Id.*, 375, 87 S.Ct. at 1863.

Plaintiffs' § 1 claim is not supported by any direct probative evidence that an illegal conspiracy occurred. Further, plaintiffs have failed to rebut the defendants' legitimate explanations for the alleged anti-competitive conduct.

Plaintiffs' § 2 claim can be disposed of by virtue of plaintiffs' failure to establish that the defendants have market power in a properly defined market. There is insufficient evidence to support what appears to be plaintiffs' market definition of either CGH alone, public hospitals in Clayton County, or the Atlanta area. Moreover, plaintiffs have offered no evidence to refute defendants' contention that the proper market in this case includes examination of both the alternatives available to consumers of hospital services and the alternatives available to anesthesiologists seeking employment at Clayton General. *See Gonzalez v. Insignares*, 1985–2 Trade Cas. (CCH) par. 66,701, 1985 WL 2206 (N.D.Ga.1985). Plaintiffs' own past practice in several states indicates the market for anesthesi-

ologists is very broad. Further, even if the properly defined market for consumers of hospital services is limited to Clayton County, it is doubtful that the effect of defendants' action, would be "substantially adverse" such that an antitrust violation occurred.

Thus, reduced to its essentials, plaintiffs' Sherman Act claims rest not on a showing of anti-competitive impact, but merely on the fact that they are disappointed competitors who will now be forced to provide anesthesiology services elsewhere. This misplaced focus is illustrated by plaintiffs' continued argument that monopoly is illustrated by the fact that *they* may not be able to secure other employment in Atlanta areas. In *Hyde, supra,* the Supreme Court confirmed that the mere fact that a disappointed competitor must practice elsewhere does not constitute "antitrust injury." In rejecting an antitrust challenge to a hospital's exclusive contract with a single group of anesthesiologists, the Supreme Court observed that:

> It may well be true that the [exclusive] contract made it necessary for [plaintiff] and others to practice elsewhere.... But there has been no showing that the market as a whole has been affected at all by the contract.... There is simply no showing here of the kind of restraint on competition that is prohibited by the Sherman Act.

*Id.,* 31–32, 104 S.Ct. at 1568.

Finally, plaintiffs seek to bolster their anti-competitive claim by alleging that prices for anesthesiology services will be higher if the exclusive contract is enforced. Disregarding the lack of credible evidence to support this assertion, if it is assumed that this price effect is true, injury to competition would not be established because the relevant inquiry is not whether prices will increase, but whether they will increase over the competitive level. *Drs. Steuer & Latham v. National Medical Enterprises, Inc.,* 672 F.Supp. 1489, 1502 (S.C. 1987) affirmed 846 F.2d 70 (4th Cir.1988). Plaintiffs, however, fail to offer any evidence regarding competitive pricing levels.

For the reasons stated above, given the evidence presented, it does not appear that plaintiffs have a substantial likelihood of success in meeting their burden of showing any antitrust violation has occurred in this case.

### Breach of Contract Claim

Plaintiffs allege that the October 10, 1990 resolutions of the Ad Hoc Committee of the Anesthesiology Department resulted in a "valid and binding settlement agreement," which plaintiffs are entitled to enforce as parties or third party beneficiaries to the agreement. This allegation does not overcome the evidence that clearly establishes that the Contract plaintiff contends was amended includes a provision that required modifications to be in writing and defendant Davis clearly indicated his unwillingness to so modify, or that the results of the meeting did not constitute an enforceable agreement.

In addition, plaintiff alleges that the CGH medical by-laws, rules and regulation establish a contractual responsibility of CGH. Regardless of whether such a responsibility was created, as indicated above, plaintiff has failed to show that the administrative decision made by the Authority required compliance with the due process procedure of the by-laws.

In summation, like the due process and antitrust claims discussed above, plaintiffs have failed to show that there is a substantial likelihood that they will prevail on the merits of their breach of contract claim.

### (2) Irreparable Harm to Plaintiffs

Monetary injury alone does not justify an injunction. *See Cate v. Oldham,* 707 F.2d 1176, 1189 (11th Cir.1983) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). Plaintiffs argue that damage to their reputation and professional standing makes an injunction appropriate. The flaw in this contention is that plaintiffs have failed to show how enforcement of the exclusive contract, by allowing anesthesiology services to be provided by only members of RAA, will harm their reputation. The evidence shows that the action of closing the Depart-

ment of Anesthesiology at CGH was an administrative decision that was not intended to prevent plaintiffs or any other specific doctor from practicing. Plaintiffs agree that the decision was not based on any finding concerning their competence. (Plaintiff's Brief in Reply to Briefs Submitted by the Hospital and Davis Defendants, p. 12 ("Plaintiff's Reply")).

Plaintiffs allege that the decision to close the Anesthesiology Department was "ostensibly based" on the grounds that plaintiffs "constitute a disruptive force within the Department and actively 'solicit' assignments at the expense of patient care." (Plaintiff's Reply, p. 9). Based on this contention, plaintiff asserts that they will suffer irreparable harm in that they will lack the "excellent references" needed to join the staff of another hospital. Although it is possible that the long history of dissention and problems in the CGH Anesthesiology Department may effect plaintiffs' ability to obtain employment elsewhere, that in no way creates an enforceable obligation so as to establish the necessary element of irreparable harm.

Further, if plaintiffs ultimately prevail and the exclusive contract is set aside, they can be compensated monetarily for any resulting loss of income occurring as a result of enforcement of the exclusive contract. A temporary loss of income, insufficiency of savings or difficulties in finding other employment during the pendency of this action also does not support finding an irreparable injury. *See Sampson v. Murray,* 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953 n. 68, 39 L.Ed.2d 166 (1974).

(3) Balancing the harm

As discussed above, plaintiffs can be compensated monetarily for a decision to not grant injunctive relief which turns out to be "wrong." On the other hand, an injunction prohibiting enforcement of the exclusive contract would interfere with CGH's efforts to establish an organization of the Anesthesiology Department that will overcome the internal conflicts in the department and remedy the well documented past problems. Further, such an injunction

would abort the scheme by which CGH seeks to comply with the mandates of the State and Federal regulatory bodies that have noted significant problems with the operation of the Anesthesiology Department. Thus, the harm the defendants would suffer from the issuance of an injunction is more substantial than the loss of earnings that plaintiffs might suffer without one.

(4) The Public Interest

Plaintiffs argue that the exclusive contract is detrimental to the public interest because the patients are not free to choose their anesthesiologist.

In setting forth a public interest argument, plaintiffs also assert that there are "concerns over the quality of care" provided by RAA members. (Plaintiff's Reply, p. 12). This problem, if one exists, is properly handled through the Corrective Action procedure of the CGH by-laws in the same manner that plaintiffs would want a like allegation directed at them treated.

Plaintiffs also allege that enforcement of the exclusive Contract will increase the cost of patient care. Plaintiffs have offered no evidence to support these alleged detrimental price effects of the exclusive contract.

In addition to the absence of a showing of detrimental effect that would result from enforcement of the exclusive contract, the court observes that the Authority's position, that the exclusive contract provides a mechanism by which they can better remedy past problems of the Anesthesiology Department, is supported by credible testimony and the fact that many other hospitals have also chosen this organization to deliver quality anesthesiology care.

*Conclusion*

Because plaintiffs have failed to carry their burden in showing any of the four factors needed to support the issuance of a preliminary injunction against enforcement of the exclusive contract, the court DE-

NIES plaintiffs' Motion for a Preliminary Injunction.

SO ORDERED.