**Enrique ROBLES, M.D., Plaintiff,**

v.

**HUMANA HOSPITAL CARTERSVILLE; Fareed Z. Kadum, M.D.; and Charles Goolsby, Defendant.**

**Civ. A. No. 4:89–CV–204–HLM.**

United States District Court,
N.D. Georgia,
Rome Division.

Feb. 27, 1992.

---

Allan Leroy Parks, Jr., Kirwan Goger Chesin & Parks, Atlanta, Ga., for plaintiff.

Kevin E. Grady, Alston & Bird, Atlanta, Ga., Robert Lowry Berry, Robert Maddox Brinson, Brinson Askew & Berry, Rome, Ga., Robert Gaither Tanner, Long Weinberg Ansley & Wheeler, Atlanta, Ga., for defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

This case is before the Court on Defendants' Motion for Summary Judgment. On October 21, 1991, this Court ordered both parties to brief the issue of whether Plaintiff has standing to prosecute the anti-trust claims alleged in this case. The parties have submitted those briefs. After reviewing the parties' submissions, the depositions and the entire record, the Court concludes that Plaintiff does not meet the *Todorov* standing requirements, and, consequently, he does not have standing to prosecute the alleged anti-trust claims. In regard to the pendent state law claims, the Court grants Defendants' Motion for Summary Judgment as to Count III, Breach of Contract and denies the motion as to Count II, tortious interference with business and contract relationships and Count IV, intentional infliction of emotional distress. Furthermore, sufficient evidence has been presented to allow Plaintiff's request for punitive damages to go forward.

## FACTS

Plaintiff, Dr. Enrique Robles, has practiced medicine in the Cartersville, Georgia, area for over fifteen (15) years. He procured a position on the medical staff at Sam Howell Hospital in 1973. In 1983, Sam Howell Hospital was purchased by Humana Hospital and the name changed to Humana Hospital Cartersville (HHC).

Upon Humana's acquisition of Sam Howell Hospital all staff members were required to submit applications for medical staff privileges. Prior to the acquisition, Dr. Robles had a very good record as a obstetrician in the hospital. Although the record indicates that Plaintiff had some difficulty with other doctors and the hospital's policies and rules, Defendants admit he was a technically good doctor. Consequently, he was approved for a two year appointment to the hospital staff, which Humana renewed in 1986.

When Humana purchased Sam Howell Hospital one of the hospital's goals was to change the non-profit county owned hospital into a private proprietary hospital. Because there were only two obstetricians on the staff, Drs. Goolsby and Robles, the Hospital began the search for a new obstetrician. During this search they found Dr. Kadum and, in 1984, convinced him to come to Cartersville and practice obstetrics.[1]

Although Dr. Kadum and Dr. Robles were colleagues on the staff, they were never friends. From the very beginning of Dr. Kadum's arrival at HHC, a thinly veiled animosity existed between the two doctors. This animosity developed due to Dr. Kadum's initial reaction concerning Dr. Robles' competency and the fact that Dr. Robles did not call on Dr. Kadum to assist in surgery as did Dr. Goolsby.

The impetus behind the hospital investigation and eventual revocation of Plaintiff's staff privileges was a forceps induced delivery conducted by the Plaintiff. On July 31, 1987, Dr. Robles was attending the delivery of a first time mother. After two hours of protracted labor, Dr. Robles decided to use forceps to help quicken the delivery. Because of the use of forceps, the baby was badly bruised. Although no medical malpractice case was filed against the Plaintiff, the two other obstetricians on staff, Dr. Goolsby and Dr. Kadum, brought this incident to the attention of the medical staff. The hospital board decided to investigate the incident in question and, eventually, the investigation expanded to include Dr. Robles' general behavior over his fifteen year tenure at HHC.

Despite the known animosity between Drs. Kadum and Robles, Dr. Kadum was appointed to be a member of the four doctor Ad Hoc committee in charge of the investigation into Dr. Robles' behavior at the hospital. After a review of numerous of Plaintiff's charts and records over his fifteen year career, Dr. Kadum, along with the other members of the Ad Hoc committee, recommended to the Executive Committee that Dr. Robles' privileges be terminated. The Executive Committee then adopted the Ad Hoc Committee's recommendation and sent their report to the Hospital Board. After the Hospital Board held a hearing, which Dr. Robles attended, the Board accepted the Executive Committee's recommendation and first suspended Dr. Robles' privileges, then later terminated those privileges. Subsequently, Dr. Robles also lost his office space in the Humana Medical office building.

At the hearing before the Hospital Board, each side presented evidence concerning the forceps induced delivery which started the investigation. Dr. Boehm, the hospital's expert, could not state that the delivery was malpractice or that the judgment exercised by Dr. Robles was erroneous. Instead, all he could conclusively criticize was Plaintiff's lack of proper documentation of the baby's vital statistics during the delivery. Dr. Robles' expert, however, stated that the delivery was correct given the circumstances of the situation. Furthermore, she stated that the standard in the profession is that the doctor does not

1. As part of the recruitment package, HHC guaranteed Dr. Kadum $7000 a month in compensation and rent free office space.

have to write down all the noted vital signs as there are other hospital staff members who are responsible for noting the vital signs and the doctor merely signs-off on the chart.

After Dr. Robles had his privileges revoked, both HHC and the remaining obstetricians realized an increase in their business. Within three months of Plaintiff's termination, Dr. Goolsby stated that his practice was full and that he was able to adjust his practice and accept no new obstetric patients from the outside and still maintain his full time patient load of 12—15 deliveries a month. Dr. Kadum's practice also increased after Dr. Robles' termination. His practice blossomed so much that he has hired a new associate, Dr. Riebot, to help with his growing obstetrics practice. Indeed, the hospital has even contracted with another doctor, Dr. Leedy, to eventually replace Dr. Goolsby who is retiring from the obstetrics portion of his practice.[2] Now, Dr. Leedy is looking to hire an associate to help his practice. As to the Hospital, it has increased its obstetrics revenue from $1.9 million in 1987 to $2.7 million in 1989, an increase in revenues of 42 percent.

Dr. Robles, however, has not taken part in this increase in obstetrics business. As a result of his losing his privileges at Humana, Dr. Robles has lost most of his practice in Cartersville. In fact, Dr. Robles has been forced to try and move his practice to Atlanta. Seeking compensation and retribution for the actions taken against him, Dr. Robles filed this lawsuit.

Jurisdiction in this case is based on the Sherman Act, as diversity jurisdiction or other federal question jurisdiction does not exist. Dr. Robles has alleged that Drs. Goolsby and Kadum conspired with HHC in violation of the Sherman Anti–Trust Act to obtain a monopoly over the practice of obstetrics and gynecology in Bartow County.[3] Plaintiff also claims that the hospital is an essential facility and that HHC has used or is attempting to use its monopoly power in the hospital services market to leverage itself into and control the obstetrics market in Bartow County. In addition, Plaintiff has included pendant state law claims for breach of contract, tortious interference with business and contract relationships and intentional infliction of emotional distress.

## SUMMARY JUDGMENT STANDARD

▪ Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The moving party bears the heavy burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). This burden is met by "pointing out to the District Court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This initial burden remains with the moving party even when the issue involved is one on which the non-movant will bear the burden of proof at trial. *Russ*

**2.** Like, Dr. Kadum, when both Dr. Riebot and Dr. Leedy were recruited to join HHC each received a salary guarantee. Dr. Riebot received $10,417 a month and Dr. Leedy received $12,500 a month. Dr. Kadum also received a $30000 loan from HHC to help relocate Dr. Riebot to Cartersville.

**3.** In the Eleventh Circuit, a hospital and its staff doctors are not considered a single entity and, therefore, they can conspire with each other in violation of the antitrust laws. *See Bolt v. Halifax Hosp. Medical Ctr.*, 891 F.2d 810, 819 (11th Cir.1990), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). Other Circuits, however, have held that hospitals and their medical staffs cannot conspire together as they are considered a single entity during the peer review process. *See Oksanen v. Page Memorial Hosp.*, 945 F.2d 696 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *Nurse Midwifery Assoc. v. Hibbett*, 918 F.2d 605 (6th Cir.1990), *cert. denied*, U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991); *Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 F.2d 96 (3rd Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989).

*v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.1991).

Once the moving party has fulfilled its burden and shown that no factual issues exist which could warrant a trial, the burden shifts to the non-movant to come forward with specific facts showing that a genuine dispute still does exist. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark Inc.*, 929 F.2d 604 (11th Cir.1991). This burden shifts back to the non-moving party, however, only after the moving party meets its initial burden and shows that no factual issues remain for trial. *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.1991). If the moving party does not meet its initial burden, the non-movant is not obligated to put forward additional evidence.

The District Court's duty is to view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir. 1983). In deciding a motion for summary judgment, it is not the Court's function to decide issues of genuine material fact. Rather, the Court's function is to determine whether such an issue exists to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). It is the applicable substantive law which will identify what facts are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Facts which in good faith are disputed, but which do not resolve or affect the outcome of the suit will not properly preclude the entry of summary judgment. *Id.* In short, such facts are not material. The materiality of a fact rests solely on the governing substantive law. A district court "can only grant summary judgment 'if everything in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986), (quoting

*Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980)).

Genuine disputes are those where the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Moreover, for factual issues to be "genuine" they must have a real basis in the record. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts. ... Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 586, 106 S.Ct. at 1356 (citations omitted.) "[T]his standard mirrors the standard for a directed verdict.... [T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

### ANTI–TRUST CLAIMS

#### A. ESSENTIAL FACILITY AND MONOPOLY LEVERAGING.

Plaintiff asserts that HHC is an "essential facility" as to his profession, and that the hospital's revocation of his privileges is a per se violation of the antitrust laws. The essential facility doctrine states that "where facilities cannot practicably be duplicated by would be competitors, those in possession of them must allow them to be shared on fair terms. It is an illegal restraint of trade to foreclose the scarce facility." *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Although a hospital is necessary to the performance of obstetrics, this Court concludes that because the practice of medicine in Georgia is a privilege, and not a right, *see Stein v. Tri–City Hosp.*, 192 Ga. App. 289, 292, 384 S.E.2d 430 (1989), "it would be singularly inappropriate to apply a doctrine which would prevent a hospital from keeping doctors it had judged unqualified off its staff. Neither public policy nor

the Sherman Act can countenance such a result." *Pontius v. Childrens Hosp.*, 552 F.Supp. 1352, 1370 (W.D.Pa.1982). *See Castelli v. Meadville Medical Ctr.*, 702 F.Supp. 1201, 1209 (W.D.Pa.1988), *aff'd*, 872 F.2d 411 (3rd Cir.1989). *See also Tarabishi v. McAlester Regional Hosp.*, 951 F.2d 1558 n. 15 (10th Cir.1991). Consequently, this Court concludes that the essential facility doctrine is not applicable to cases involving hospital peer review decisions which revoke or limit a doctor's medical staff privileges.

Plaintiff also asserts that HHC is using its monopoly power in the hospital services market to monopolize or gain an unfair competitive advantage in the secondary market of obstetrical/gynecological services. Specifically, Plaintiff argues that HHC is using its market power in the hospital services market, to favor financially certain doctors, while not giving the same advantages to other competitors. Plaintiff claims that other independent doctors cannot compete in Bartow County without HHC's permission and financial support.

 This use of power in one market to dominate or control a secondary market is called "monopoly leveraging". *See Key Enterprises of Del., Inc. v. Venice Hosp.*, 919 F.2d 1550, 1566–68 (11th Cir. 1990). Plaintiff's application of this theory in this case, however, flies in the face of both practical sense and economic reality. Although the Plaintiff's primary market of hospital services is correct, HHC cannot monopolize or attempt to monopolize the ob/gyn services market because HHC does not provide those services. A hospital does not render the ob/gyn services, it only allows a doctor the space where the doctor renders those services. Furthermore, the hospital does not prevent a doctor from having privileges at another hospital. The doctors choose to have privileges only at HHC because it is more convenient for them. Therefore, it is, in practical sense, impossible for a hospital to monopolize or attempt to monopolize a market that it cannot participate in or realistically control. *See Key Enterprises*, 919 F.2d at 1566–68 (11th Cir.1990) (hospital could not use its monopoly power over hospital services market to gain control over home healthcare services market when it became a provider of home healthcare services); *Kerasotes Mich. Theatres, Inc. v. National Amusements, Inc.*, 854 F.2d 135 (6th Cir.1988) (theatre company cannot use strong position in other geographic markets to gain unfair advantage in relevant geographic market for film distribution); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2nd Cir.1979) (defendant who sold both film and cameras could not use its power in film market to gain unfair advantage in camera market).

## B. ANTITRUST STANDING.

Section 4 of the Clayton Act provides a private right of action for injury caused by a violation of the antitrust laws:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit including a reasonable attorney's fee.

15 U.S.C.A. § 15 (supp 1990).

"A literal reading of the statute, [however], is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated Gen. Contractors of Cal., v. Cal. State Council of Carpenters*, 459 U.S. 519, 529, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1983). Therefore, federal courts have required that a Plaintiff have antitrust standing to maintain an antitrust suit. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991); *Austin v. Blue Cross and Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir.1990).

 Standing to bring an antitrust claim is a question of law which the Court determines by examining the allegations

contained in the complaint. *Municipal Utilities Bd. v. Alabama Power Co.*, 934 F.2d 1493, 1498 (11th Cir.1991). Antitrust standing involves more than the "case or controversy" requirement of constitutional standing. *Id.; Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1493 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986). "An antitrust standing analysis involves a two pronged inquiry into (1) whether the plaintiff has suffered an antitrust injury; and, (2) whether the plaintiff is an efficient enforcer of the antitrust laws." *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1571 (11th Cir.1991) (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir.1991), *petition for cert. filed*, U.S. Jan. 8, 1992 (No. 91–1108).[4] Therefore, for Dr. Robles to have standing to maintain his antitrust claims, he must show that he has been injured in the manner the antitrust laws were intended to prevent and that he is an efficient enforcer of the antitrust laws.

### 1. *Antitrust Injury*

In 1977, the Supreme Court specifically enunciated the concept of antitrust injury in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). There the Court stated:

> [F]or plaintiffs to recover treble damages ... they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.

*Id.* at 488–89, 97 S.Ct. at 697. This definition is designed to insure that "the public and private enforcement of the antitrust laws will further the same goal of increased competition." *Austin*, 903 F.2d at 1389–90. Consequently, the Courts have interpreted the antitrust laws as being "enacted for the 'protection of competition, not competitors.'" *Todorov*, 921 F.2d at 1450 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)); *accord, Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc.*, 919 F.2d 1517, 1522 (11th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 68, 116 L.Ed.2d 43 (1991); *Key Enterprises of Del., Inc. v. Venice Hosp.*, 919 F.2d 1550, 1559–60 (11th Cir.1990).

To apply the antitrust injury prong of the standing test, it is necessary to identify the injury for which Dr. Robles is invoking the antitrust laws as a remedy. Dr. Robles' alleged injury consists of a concerted effort by the named Defendants to drive him from the market so that they can take over his market share of the obstetrics practice. He argues that the relevant geographic market is Bartow County and the relevant product market is obstetrics.[5] He claims he has suffered antitrust injury be-

---

**4.** Plaintiff makes an imaginative attempt at arguing that the *Todorov* analysis of antitrust standing is not acceptable Eleventh Circuit precedent because only one active Eleventh Circuit judge voted in favor of that analysis. *Plaintiff's Supplemental Brief* at 5 n. 2. In *Todorov*, Judge Anderson dissented from the standing analysis and Judge Eschbach, who voted in the majority with Chief Judge Tjoflat, is a Senior Judge of the Seventh Circuit. Therefore, according to Plaintiff only one sitting Eleventh Circuit judge, Chief Judge Tjoflat, has approved the *Todorov* standing analysis.

Besides being a rather specious argument, a quick glance through current Eleventh Circuit caselaw would have shown Plaintiff's counsel that *Todorov* has been affirmatively cited at least three times in Eleventh Circuit cases, and two of those cites have specifically adopted *Todorov*'s standing analysis. *See Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1571 (11th Cir.1991); *Municipal Utilities Bd. v. Alabama Power Co.*, 934 F.2d 1493, 1498 (11th Cir.1991); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1574 (11th Cir.1991). Consequently, Judges Johnson, Hatchett and Cox and Senior Judges Godbold and Dyer have all cited, with approval, *Todorov*'s standing analysis as being the law in the Eleventh Circuit. Even without these subsequent affirmations of *Todorov*'s standing analysis, however, this Court is bound by Eleventh Circuit decisions regardless of the actual number of Eleventh Circuit judges sitting on the panel and voting in the majority.

**5.** *See Pontius v. Children's Hosp.*, 552 F.Supp. 1352, 1365 (W.D.Pa.1982) ("Before a court can evaluate the merits of a plaintiff's antitrust claims, it first must identify the market that the defendants' alleged unlawful conduct affects.") (citations omitted).

cause he can no longer compete in the relevant markets.

■■■ For purposes of this summary judgment motion, the Court will assume that HHC's peer review process affects interstate commerce, *see Summit Health, Ltd. v. Pinhas,* —— U.S. ——, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), and that both of Dr. Robles' definitions are correct: the geographic market is Bartow County and the product market is obstetrics.[6] Furthermore, the Court will assume that the Defendants in fact conspired to keep Dr. Robles out of the relevant market. Even with these assumptions, however, Dr. Robles has not shown that he has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp,* 429 U.S. at 488–89, 97 S.Ct. at 697.

The evidence in the record shows that Bartow County has lost one doctor and gained two and possibly a third in the near future. There is no evidence showing that the quality of care has decreased; that the cost to have an obstetric exam has risen; or, that the hospital has raised its rates or changed its behavior in any anti-competitive way.[7] In fact, the evidence shows that now patients have more of a choice concerning which doctor to visit and that HHC is a more competitive hospital with the addition of the new doctors.

Plaintiff attempts to demonstrate that he has suffered antitrust injury by pointing out the economic relationship between the defendants. Plaintiff states that because the remaining doctors have financial ties to HHC, the defendants have conspired together to monopolize the obstetric market in Bartow County by eliminating from competition the independent doctors who are not as connected to HHC and who might refer patients to other hospitals. Essentially, Plaintiff argues that the Defendants have conspired to eliminate all the independent doctors in Bartow County.

Plaintiff's reliance on the employment relationship among the doctors and the hospital, however, is misplaced. A patient coming into a hospital for an exam is not going to know that Dr. Riebot works for Dr. Kadum, unless she is previously told about the relationship or the doctor tells her. In addition, patients will not know whether any of these doctors are receiving compensation from the hospital directly or if they only receive income from their patients. Regardless of the patient's knowledge, however, this employment relationship will not substantially effect her choice of a doctor.

A patient will choose a doctor she is comfortable with and one who is competent, not one that is or is not working for Dr. Kadum. For example, if Dr. Kadum hires another doctor who is incompetent, although Dr. Kadum might be legally liable for any injuries the incompetent doctor inflicts, Dr. Kadum's own medical practice will probably not suffer. He might not make any money with the new employee, but his individual medical practice will not suffer. A doctor's practice is governed by

---

**6.** The relevant product market cannot include gynecology because Dr. Robles is still competing in that market as he does not need staff privileges at a hospital to service his patients gynecological needs.

**7.** Numerous cases have intimated that an impact on pricing or quality of service is a very strong indicator on whether the market has been affected by the alleged anti-competitive actions. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 31 n. 52, 104 S.Ct. 1551, 1568 n. 52, 80 L.Ed.2d 2 (1983) (no showing that tying arrangement had any effect on quality or price of anesthesiological services at hospital); *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1455 (11th Cir.1991) (doctor was no "champion of the consumers" because he was

seeking the benefit of lessened competition and increase in prices); *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 709 (4th Cir.1991) (no showing of anti-competitive effect because no evidence of increase in price or decrease in number of doctors in market); *Bellam v. Clayton County Hosp. Auth.,* 758 F.Supp. 1488, 1494 (N.D.Ga.1990) (allegation that prices will increase in future is not sufficient for antitrust injury, must allege that prices will increase over competitive level); *Drs. Steuer & Latham v. National Medical Enter., Inc.,* 672 F.Supp. 1489, 1502 (D.S.C.1987) (no showing that prices for pathologists rose to be above competitive levels after hospital entered exclusive arrangement with other doctor), *aff'd,* 846 F.2d 70 (4th Cir. 1988).

his own individual competency, not by who he is associated with. His relationship with other doctors may be the initial reason for the patient's first visit, but it is the doctor's individual skill and competency which keeps the doctor competitive and his patient's coming back. Consequently, it is not the economic relationship that governs here, it is the fact that in the relevant product market and relevant geographic market a patient has a wider choice of doctors now than when Dr. Robles had privileges at HHC. *See Mays v. Hospital Auth. of Henry County,* 596 F.Supp. 120, 122 (N.D.Ga.1984). "Without a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 31, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1983).

The harm alleged in the complaint is really only harm to the individual doctor and not to competition within the marketplace. "Thus, reduced to its essentials, plaintiff['s] Sherman Act claims rest not on a showing of anti-competitive impact, but merely on the fact that [he] is [a] disappointed competitor who will now be forced to provide [obstetric] services elsewhere." *Bellam v. Clayton County Hosp. Auth.,* 758 F.Supp. 1488, 1494 (N.D.Ga. 1990). *See Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 709 (4th Cir.1991). Without the necessary ingredient of antitrust injury, a plaintiff cannot merely recite the mantra of antitrust jurisprudence and expect his allegations to magically establish a sufficient Sherman Act infringement case.

### 2. *Efficient Enforcer*

▆ In addition, Plaintiff is not an efficient enforcer of the antitrust laws. The efficient enforcer factors necessary for antitrust standing are a collection of factors "that might be useful in determining whether a party is a proper plaintiff in a particular [antitrust] suit." *Todorov,* 921 F.2d at 1451. These factors include (1) the directness of the injury and whether there "exists an identifiable class of persons whose self-interest would motivate them to vindicate the public interest in antitrust

enforcement", *Id.;* (2) the nature of the damages; (3) the importance of avoiding duplicative recoveries; and, (4) whether the plaintiff can enforce an antitrust judgment efficiently and effectively. *Id.* at 1451–52.

▆ With these factors in mind, two more easily imagined efficient enforcers in this case are obstetric patients and the government. Both have a stronger interest in ensuring that prices and services remain at competitive levels. Dr. Robles only interest is that *he* be allowed to compete in Bartow County, not that patients receive quality services at competitive prices. Dr. Robles has only made conclusory statements and unsupported allegations concerning what might happen in the future to obstetric prices and services if he is not allowed to compete in this particular geographic market. As in *Todorov,* however, "[i]f the [obstetricians] or [HHC] are acting anti-competitively and are charging an inflated price, [or providing inferior services for the same prices now that Dr. Robles is gone], the patients, the insurers or the government, all of whom are interested in ensuring that consumers pay a competitive price may bring an action to enjoin such practice." *Id.* at 1455.

Consequently, as demonstrated above, Plaintiff has failed to meet either of *Todorov's* standing requirements and, therefore, the Court grants Defendants' motion for summary judgment as to Count I.

## STATE LAW CLAIMS

Plaintiff has also alleged state law claims in this antitrust case. As some of the state law claims will be time barred if dismissed, the Court will use its discretion and retain jurisdiction of these pendent state law claims. *Ross v. Bank South, N.A.,* 885 F.2d 723, 732 (11th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990); *Pharo v. Smith,* 625 F.2d 1226, 1227 (5th Cir.1980).

### 1. *Breach of Contract.*

Plaintiff alleges that HHC's bylaws are a contract *per se* and that the Hospital breached its contract with him when it failed to comply with those bylaws during the investigation that lead to the revocation

of his staff privileges. Defendant argues, however, that there has not been a breach of contract because the hospital bylaws cannot be considered a contract between the hospital and Plaintiff.[8] Defendant cites *Todd v. Physicians & Surgeons Community Hosp., Inc.*, 165 Ga.App. 656, 302 S.E.2d 378 (1983) as holding that hospital bylaws do not constitute a contract between the hospital and the doctors on its staff. Neither party addresses the requirements for a valid contract in Georgia.

In *Todd*, two podiatrists challenged their hospital's ability to *amend* the hospital bylaws so that only doctors eligible for membership in the American Medical or American Dental Associations could be members of the hospital medical staff. Because Dr. Todd, a podiatrist, was ineligible for membership in the AMA, the new bylaw prevented him from being reappointed to the staff at the hospital. Consequently, Dr. Todd sued the hospital and various members of its staff alleging that with the adoption of the new amendment to the bylaws he had been wrongfully terminated from the practice of his profession in violation of the bylaws. He sought equitable relief by way of reinstatement because he claimed that the hospital breached his contract when they amended the bylaws and excluded him from the staff. The Court of Appeals disagreed and held that:

> The corporate defendants having the power and authority to promulgate rules and regulations setting forth the requirements and qualifications necessary to gain appointment to the medical staff of the hospital cannot be said to have violated any contractual obligations with the plaintiffs in *changing* their bylaws as the case was here.

*Id.* at 662, 302 S.E.2d 378 (emphasis added).

Contrary to Defendants contention, the *Todd* court did not address the question of whether the bylaws were a contract *per se*.[9] The Court only addressed whether the Hospital had the authority to amend the bylaws and whether the bylaws were correctly amended, not whether the bylaws were a contract.

The situation in *Todd* was that the hospital changed the future agreement it would have with its doctors, not the present agreement it currently had with Dr. Todd. The Court concluded that the hospital had the power to change those bylaws and that Dr. Todd accepted that possibility when he accepted a staff position at the hospital. *See Stein v. Tri–City Hosp.*, 192 Ga.App. 289, 293, 384 S.E.2d 430 (1989). Consequently, Dr. Todd was allowed to finish his term appointment, he just was not reappointed. If the hospital had made the amendment effective during Dr. Todd's current employment term, then the Court of Appeals would have had to decide whether the bylaws were in fact a contract. As it is, the Court of Appeals was not presented with the issue and, consequently, did not decide it. Therefore, contrary to defendants' assertion, *Todd* does not dispose of this issue.

*Are the Hospital bylaws a contract?*

■ The question of whether the bylaws, *per se*, are a contract is one of first impression in Georgia. Other jurisdictions, however, have addressed this issue. One court, after analyzing a hospital's bylaws under traditional contract law, concluded that the bylaws were not a contract between the doctor and the hospital. *See Gianetti v. Norwalk Hosp.*, 211 Conn. 51, 557 A.2d 1249 (1989). Although the court held the bylaws were not a contract *per se*, it also held that the bylaws were subject to judicial review and enforceable because of

---

**8.** Defendants also argue that even if the hospital violated the bylaws, its action was privileged. The hospital claims its actions are privileged because it is statutorily mandated to monitor the qualifications of its medical staff. This mandate to ascertain the qualifications of its staff, however, does not give the hospital carte blanche to do as it sees fit. The hospital still has an obligation to comply with its own rules and regulations. Consequently, the hospital's assertion of absolute privilege is erroneous.

**9.** Although the *Todd* court reiterated the trial court's finding that "the medical staff bylaws do not constitute a contract between the plaintiffs and the defendants...." *Id.* at 660, 302 S.E.2d 378 this statement is only dicta as the Court never addressed the issue on appeal.

the relationship between the doctor and the hospital and because the bylaws and procedures therein were statutorily mandated. *Id.* 557 A.2d at 1255. Other Courts have held that hospital bylaws are binding enforceable contracts once they are approved and adopted by the hospital's governing board. *See Lawler v. Eugene Wuesthoff Memorial Hosp. Assoc.,* 497 So.2d 1261 (Fla.Dist.Ct App.1986); *Miller v. Indiana Hosp.,* 277 Pa.Super. 370, 419 A.2d 1191 (1980). Still other jurisdictions have held that "the hospital's obligation to act in accordance with its bylaws is independent of any contractual right of the doctor." *Balkissoon v. Capital Hill Hosp.,* 558 A.2d 304, 308 (D.C.1989). *See Lewisburg Community Hosp., Inc. v. Alfredson,* 805 S.W.2d 756 (Tenn.1991) (hospital bylaws are integral part of relationship between hospital and doctor and, therefore, hospital is required to abide by the bylaws when revoking radiologist's privileges). This Court agrees with the reasoning and holding of *Gianetti* and concludes that HHC's bylaws are not an enforceable contract *per se,* but that the bylaws and the procedures provided therein are judicially enforceable.

In Georgia, for there to be a valid contract "there must be a subject matter, a consideration, and mutual assent by all parties to all the terms." *Panfel v. Boyd,* 187 Ga.App. 639, 645, 371 S.E.2d 222 (1988) (citing O.C.G.A. § 13–3–1 (1982)). Here, the bylaws govern both the hospital's right to ensure quality care at its facilities and the procedures the hospital must follow when disciplining a doctor for deviating from that level of quality care. Therefore, the subject matter of this alleged contract is the procedures utilized by the hospital to govern that relationship. The bylaws have also met the second requirement of mutual assent because Dr. Robles agreed to act in a professional manner, while the hospital agreed that if Plaintiff did not act in that manner, it would utilize a given procedure to discipline the doctor's behavior. Both parties agree that the procedures set out in the bylaws would govern that dispute. The problem arises, however, with what was the consideration in this alleged contract.

 Every contract must be founded upon proper consideration. *Lee v. Green,* 217 Ga. 860, 126 S.E.2d 417 (1962); *Zachos v. Citizen & Southern Nat'l Bank,* 213 Ga. 619, 100 S.E.2d 418 (1957). Furthermore, the consideration must be stated in the contract or at least be ascertainable from the contract. *Summerlin v. Beacon Investment Co., Inc.,* 120 Ga.App. 296, 298, 170 S.E.2d 307 (1969), *aff'd,* 226 Ga. 227, 173 S.E.2d 672 (1970). However, that consideration cannot be a promise to do something which the promisor is already obligated to do. *Holsomback v. Caldwell,* 218 Ga. 393, 128 S.E.2d 47 (1962); *Owings v. Georgia R.R. Bank & Trust Co.,* 188 Ga.App. 265, 372 S.E.2d 825 (1988).

 The bylaws cannot be considered a contract *per se* because there is no mutual exchange of consideration which brought them into existence.[10] The Hospital had the previous obligation to create those bylaws and to develop a procedure for reviewing a doctor's competency. Under O.C.G.A. § 31–7–15 (1991), a "hospital or

---

**10.** The Plaintiff puts forward no argument as to what the consideration may have been for this alleged contract. One possibility is the doctor's agreement to send patients to the hospital in exchange for the hospital's promise to care for the patients and treat the doctor fairly if a discipline problem would arise in the future. This agreement, however, cannot be the consideration necessary to transform the bylaws into a contract *per se.*

A physician/hospital relationship is very difficult to define. In Georgia, doctors are normally considered independent contractors, not employees of hospitals or agents of hospitals. *See Richmond County Hosp. Auth. v. Brown,* 257 Ga. 507, 361 S.E.2d 164 (1987); *Georgia Osteopathic*

*Hosp., Inc. v. Hollingsworth,* 242 Ga. 522, 250 S.E.2d 433 (1978); *Whitaker v. Zirkle,* 188 Ga. App. 706, 374 S.E.2d 106 (1988); *West End Investments of Atlanta, Inc. v. Hills,* 188 Ga.App. 274, 372 S.E.2d 665 (1988). Consequently, the patient referral agreement is the basis for the understanding that the hospital will grant the doctor privileges at the hospital, while the doctor agrees to send his patients to the hospital for treatment. This mutually beneficial relationship, however, goes to the arrangement between the two parties, not to whether the bylaws, *per se,* are a contract as Plaintiff claims. Whether the bylaws *per se* constitute a contract is a wholly different question.

ambulatory surgical center shall provide for the review of professional practices in the hospital or surgical center." The statute also states that "[n]othing in this ... section shall be deemed to require any hospital ... to grant medical staff membership or privileges to any licensed practioner of the healing arts." O.C.G.A. § 31–7–15(e) (1991). Consequently, because the hospital had the legal duty to develop the bylaws and the procedures therein independently of its association with Dr. Robles, no consideration could have been given for their creation, and, as stated above, without consideration, there cannot be a contract. *See Gianetti v. Norwalk Hosp.*, 211 Conn. 51, 557 A.2d 1249 (1989). Furthermore, there was no bargain for exchange as to the procedures utilized in the bylaws. Plaintiff had no input into the bylaws, nor did he have the power to change them. Only the Hospital had the power to change the bylaws.

The bylaws are a method by which a hospital can control the quality care it offers to the public. In Georgia, "[a] physician does not have absolute authority to practice medicine in this state and a hospital ... may restrict [or revoke] a staff member's privileges by reasonable and nondiscriminatory rules and regulations." *Stein*, 192 Ga.App. at 292, 384 S.E.2d 430. If this Court were to declare that HHC's bylaws are a contract, it would be tantamount to creating an additional damages action against a hospital for failure to follow its statutory mandate of having a peer review system. Creating a breach of contract action in this situation would run counter to this state's policy of allowing the hospital to grant or withhold staff privileges from doctors it believes are unqualified to serve on its staff. Consequently, this Court concludes that Georgia public policy would prohibit an interpretation of the bylaws which promoted them to the contract *per se* status.

 The Court does not conclude, however, that the bylaws are not judicially enforceable. The Georgia legislature would not have mandated that the hospital create these procedures, if the legislature had not intended that the hospital follow the procedures once they were implemented. Consequently, if a hospital does not comply with its own procedures, the affected doctor can bring an action to enjoin the hospital from removing him from the staff until the bylaws are fully complied with.[11] *See Mahmoodian v. United Hosp. Ctr.*, 404 S.E.2d 750 (W.Va.1991) (hospital decision to revoke obstetricians staff privileges is subject to limited judicial review to ensure substantial compliance with hospital staff bylaws); *Balkissoon v. Capital Hill Hosp.*, 558 A.2d 304, 308 (D.C.App.1989) ("Hospital must afford doctor at least all the process and protections encompassed in its bylaws."). *See also Gianetti v. Norwalk Hosp.*, 211 Conn. 51, 557 A.2d 1249 (1989) (cases cited therein).

 Therefore, this Court concludes that in Georgia the hospital bylaws, by themselves, do not constitute a contract *per se* between the hospital and the doctors. The Court also concludes, however, that the hospital is bound by the bylaws it does create and that if the hospital does not follow those procedures, the Court can enjoin the hospital to follow those procedures. In this case, however, such an injunction cannot be issued because the Plaintiff has only sought damages and not reinstatement or an injunction.

2. *Tortious Interference With Business and Contractual Relationships*

 Plaintiff has alleged that Defendants tortiously interfered with his business and contractual relationships with his patients. Defendants contend that Plaintiff has not established the necessary elements of the claims. To establish a cause of action for interference with contractual relationship under Georgia law, a plaintiff must show (1) the existence of a contractual relationship; (2) interference with the

---

**11.** The situation would be different if the person fired were an at-will employee. *See Wofford v. Glynn Brunswick Memorial Hosp.*, 864 F.2d 117, 119 (11th Cir.1989); *Garmon v. Health Group of* *Atlanta, Inc.*, 183 Ga.App. 587, 359 S.E.2d 450 (1987). Dr. Robles, however, was not an at-will employee who could be fired without following the proper procedures.

relationship by the defendant; and, (3) resulting damage to the contractual relationship. *Stamps v. Ford Motor Co.*, 650 F.Supp. 390, 392 (N.D.Ga.1986); *McDanial v. Greene*, 156 Ga.App. 549, 275 S.E.2d 124 (1980).

■ A claim for tortious interference with business relationship requires four elements: (1) defendant acted improperly or without privilege; (2) defendant acted purposefully and without privilege, with the intent to injure; (3) defendant induced a third party or parties not to enter into or continue a business relationship with the plaintiff; and, (4) defendant's conduct caused plaintiff to suffer some financial injury. *Carolina Furniture Co. v. Rhodes, Inc.*, 603 F.Supp. 69, 77 (S.D.Ga. 1984); *Hayes v. Irwin*, 541 F.Supp. 397 (N.D.Ga.1982), *aff'd*, 729 F.2d 1466 (11th Cir.1984), *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984).

■ Both of these claims require the Plaintiff to prove that the defendants intended to harm the Plaintiff. *Hayes v. Irwin*, 541 F.Supp. 397 (N.D.Ga.1982). Plaintiff has presented sufficient evidence to establish that Defendants may have conspired to destroy Plaintiff's relationships with his patients and that they intended to destroy his medical practice in Bartow county. Furthermore, as stated above, Defendants contention that their actions were privileged is incorrect. Consequently, the Court concludes that after reading the entire record, Defendants have not met their burden on summary judgment and shown that no dispute exists as to a material fact so that a reasonable jury could not find in Plaintiff's favor. Therefore, the Court denies Defendants' motion for summary judgment as to Count II.

### 3. *Intentional Infliction of Emotional Distress & Punitive Damages.*

■ Plaintiff has also alleged a claim for intentional infliction of emotional distress, Count IV, and a request for punitive damages. In Georgia, to recover on a claim of emotional distress Plaintiff must present evidence that defendants' behavior was wilful and wanton or intentionally directed to harm plaintiff; that these actions were such as would naturally *humiliate, embarrass,* or outrage plaintiff; and that conduct caused mental suffering or wounded feelings or emotional upset or distress. *Green v. Sun Trust Banks, Inc.*, 197 Ga. App. 804, 399 S.E.2d 712 (1990), *cert. denied*, Ga. Jan 7, 1991. This Court concludes that genuine disputes exist as to material facts concerning whether Dr. Robles was the victim of the intentional infliction of emotional distress. Consequently, Defendants' Motion as to Count IV is denied.

Furthermore, the Court concludes that a jury might find that Defendants behavior rises to the level of willful misconduct sufficient for the imposition of punitive damages.

Accordingly, this Court GRANTS Defendants' Motion for Summary Judgment as to the Antitrust claims, Count I, and the Breach of Contract claim, Count III, and DENIES Defendants' Motion as to the remaining state law claims.

IT IS SO ORDERED.