**Ronald ZIPPER, D.O., et al., Appellant,**

v.

**HEALTH MIDWEST, et al., Respondents,**

**Medical Center of Independence, Respondent.**

No. WD 51357.

Missouri Court of Appeals,
Western District.

Aug. 4, 1998.

Motion for Transfer to Supreme Court Denied Sept. 22, 1998.

Application for Transfer Denied
Nov. 24, 1998.

---

1. All further statutory citations are to RSMo 1994.

**402**

Ronald Zipper, pro se.

Charles J. McPheeters, Jefferson City, for respondent, Medical Center of Independence.

R. Dan Boulware, St. Joseph, for respondent Health Midwest.

Before ULRICH, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

ULRICH, Chief Judge, Presiding Judge.

Dr. Ronald Zipper and Independent Orthopedics and Sports Medicine, P.C. ("Appellants"), appeal from the trial court's order granting summary judgment in favor of the Medical Center of Independence, Inc. ("MCI"), Medical Center Park, Inc. ("MCP"), Health Midwest, Orthopedic Associates of Kansas City, Inc., and twenty-four individually named defendants[1] ("Respondents"). Appellants brought an action for breach of contract, civil conspiracy to violate Missouri antitrust laws, promissory estoppel and civil conspiracy to commit the tort of fraudulent misrepresentation after MCI breached an alleged agreement to sell Dr. Zipper an office building and then terminated Dr. Zipper's staff privileges at MCI. The trial court entered summary judgment against Appellants on all of their claims. Appellants raise three issues of trial court error. They contend that the trial court erred in granting summary judgment in favor of Respondents where (1) Dr. Zipper's failure to file a counterclaim in prior federal proceedings between the parties did not bar Appellant's claims resulting from MCI's breach of an agreement to sell Dr. Zipper an office building; (2) genuine issues of material fact exist as to whether MCI breached a contractual duty to Dr. Zipper by failing to follow MCI bylaws when it revoked Dr. Zipper's medical staff privileges; and (3) the petition stated a claim for civil conspiracy by asserting that Respondents conspired to unlawfully revoke Dr. Zippers's staff privileges at MCI. The summary judgment of the trial court on Counts I, II, and IV is affirmed. The summary judgment of the trial court with respect to Count III is affirmed as to the MCI Board members and Mr. Kaseff, but is reversed as to MCI and MCP on the theory of unjust enrichment, and the case is remanded for further proceedings consistent with this opinion.

## FACTS

Dr. Ronald Zipper is an orthopedic surgeon who has practiced medicine in Kansas City and Independence for over fifteen years. Dr. Zipper specializes in hand surgery and knee and shoulder arthroscopy.[2] For a period of time, Dr. Zipper practiced medicine through a professional corporation under the name of Independence Orthopaedics & Sports Medicine, P.C., which is the predecessor corporation to Appellant Independent Orthopedics & Sports Medicine, P.C.

Dr. Zipper successfully applied for staff privileges at MCI in 1987 and exercised the privileges until 1992. The MCI Surgical Executive Committee ("SEC") commenced a peer review of Dr. Zipper's performance as a surgeon in 1989 after questions were raised concerning the number and timing of repeat surgeries. As a member of SEC, Dr. Zipper attended its meetings and was aware his charts were being questioned. Dr. Zipper was resistive to the suggestion that his indications for surgery were questionable, and he disputed the need for indication criteria for arthroscopic surgery.

The SEC recommended to the MEC in April 1990, that an outside consultant be retained to review the knee surgeries of all

---

1. The individually named defendants were the successive chief executive officers of MCI: Harold Kaseff (1989–90) and David Christiansen (1990–present); ten members of MCI's Medical Executive Committee: Calvin H. Lentz, Jr., Janet Morgan, Robert Schwegler, Deborah Deullo, William B. Mangum, Robert Meyer, Elizabeth D. Simpson, Marc Taormina, Thomas Stribling, and C. Robert Whetstone; eight members of MCI's Board of Directors: Jerrold M. Alyea, Richard Gutknecht, Frederick Hahn, Jr., Dahlia Saldana, Faye Thomas, Lenora Wyre, Richard Brown and Elmer Kuhn; and the members of the Collins Group, an orthopedic practice in Independence that owned and controlled Orthopedics Associates of Kansas City, Inc: John Collins, Harold West, Carl Jelley and Sol Dubin. Mr. Brown and Mr. Kuhn were also directors of Health Midwest. Mr. Collins was also the chair of MCI's Surgical Executive Committee.

2. Arthroscopy involves the examination of the interior of the joint with a scope in order to carry out diagnostic and therapeutic procedures in the joint. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 142 (28 th ed.1994).

orthopedic surgeons. The Medical Executive Committee ("MEC") reviewed summary statistics of all orthopedic surgeons without identifying individual physicians. As a result of the review, the MEC hired Dr. Kenneth Wertzberger, an instructor in the Department of Surgery, Division of Sports Medicine at the University of Kansas School of Medicine, to conduct a blind review of all arthroscopic surgeries in 1989 by the twelve doctors performing such surgeries at MCI. The orthopedic surgeons under review were notified of the outside review by a memorandum dated June 7, 1990.

Dr. Wertzberger was provided a statistical overview of all arthroscopic surgeries performed in 1989 and the first six months of 1990 and pertinent medical records of all the repeat arthroscopic surgeries which occurred within sixty days of the original surgery. Dr. Wertzberger's report identified "worrisome aspects" about Dr. Zipper's statistics due to the inordinate number of plica resections,[3] the number of repeat surgeries and the timing between surgeries. Dr. Wertzberger concluded that Dr. Zipper's care in repeat cases was "sub-par with regard to the current state of the art of arthroscopy and knee treatment."

Following the receipt of Dr. Wertzberger's report in June, 1990, Dr. Lentz, President of the Medical Staff, Dr. Mangum, Chair of the Department of Surgery, Mr. Christiansen, MCI's new CEO, and Ms. Resch, an officer with the risk management division of the hospital, met to discuss the potential for a full peer review of Dr. Zipper's practice at MCI. Dr. Mangum requested MEC undertake further investigation or corrective action. MEC held a meeting on August 27, 1990, to discuss Dr. Wertzberger's report and the request for further investigation or corrective action. MEC discussed the need to review all laminectomies[4] due to a high incidence of dural tears, most of which were sustained by Dr. Zipper's patients. At the conclusion of the meeting, MEC formed an ad hoc committee to conduct a full investigation of Dr. Zipper's medical staff and clinic activities at MCI and to investigate Dr. Zipper's professional relationships with co-workers. Dr. Zipper was given notice of the impending internal investigation on August 30, 1990. Dr. Zipper retained legal counsel to respond to the committee's actions in the investigation.

The ad hoc committee formed by MEC at the August 27, 1990, meeting reevaluated the arthroscopy materials and records reviewed by Dr. Wertzberger. The ad hoc committee considered the complications in laminectomy surgeries, such as dural tears and inadvertent laminectomies, as well as the number and indications for multi-level laminectomies. The ad hoc committee asked a neurosurgeon on the medical staff to review the laminectomy procedures; the neurosurgeon recommended a formal peer review by the orthopedic surgeons performing spine surgery. At MEC's next meeting, the ad hoc committee reported to MEC that while some hospital employees and physicians found Dr. Zipper easy to work with and cordial, others found him to be demeaning, belittling and rude and were very fearful of retaliation. The ad hoc committee reported that it was not able to complete its investigation without additional information. MEC, thus, determined to request information from Dr. Zipper. MEC sent Dr. Zipper a letter on October 3, 1990, notifying Dr. Zipper of the ongoing investigation; informing Dr. Zipper that MEC was "gravely concerned" about his practice at MCI; and requesting information from Dr. Zipper regarding certain arthroscopy and laminectomy surgeries performed at MCI, his physical and mental health, and any additional information Dr. Zipper believed relevant to the investigation.

---

3. A plicia is a band of membrane or tissue in the knee and is a common condition found in approximately 40% of individuals. Literature relied upon by Dr. Wertzberger indicated the incidence of a painful shelf being diagnosed and requiring surgery was generally one to five percent. Dr. Zipper performed plica resections in 21% of his arthroscopies.

4. A laminectomy involves the surgical excision of muscular tissue or membranes from the spine. The number of laminectomies that Dr. Zipper performed was also above average.

In response to the October 3, 1990, letter, Dr. Zipper requested numerous documents and copies of correspondence, reports and medical records from MEC and SEC. MEC and SEC sent Dr. Zipper the requested information in October 1990. Dr. Zipper was granted until January 7, 1991, to respond to MEC's request for information. During this time, Dr. Zipper refused to submit to a confidential psychiatric exam and limited MEC's access to the mental health information it requested. The ad hoc committee suspended all quality assurance and peer review activities with respect to cases outside the investigation due to Dr. Zipper's disruptive and uncooperative behavior. The ad hoc committee submitted a report to MEC stating it was in "general agreement" with the findings of Dr. Wertzberger.

Dr. Michael Gross, an independent reviewer retained by Dr. Zipper generally agreed with the analysis of Dr. Wertzberger and the ad hoc committee concerning Dr. Zipper's arthroscopic procedures. Dr. Gross concluded that Dr. Zipper's practice of diagnostically arthroscoping a patient's knee and then later performing surgery to repair the problem discovered by the arthroscopy resulted in unnecessary surgeries. Dr. Gross believed that Dr. Zipper's incidence of plica resection was high, but due to the lack of follow-up information, Dr. Gross could not determine if the patients benefitted from the procedures.

Based on the report from the ad hoc committee, MEC elected to interview Dr. Zipper at the next MEC meeting in order to obtain necessary information to formulate a recommendation to the MCI Board of Directors. Dr. Zipper read a prepared statement at the March 4, 1991, MEC meeting. The MEC recommended that substantial restrictions be imposed on Dr. Zipper's practice at MCI. Dr. Zipper timely submitted a request for a hearing pursuant to the "Medical Staff · Fair Hearing Plan." Under section V.H. of the Medical Staff Fair Hearing Plan, Dr. Zipper bore the burden of proving "by clear and convincing evidence either that the proposed adverse recommendation or action lacks substantial factual basis or was arbitrary, capricious or unreasonable."

Pursuant to the procedures contained in the Medical Staff Fair Hearing Plan, the hearing committee met on July 17, 1991, to review MCI's recommendation regarding Dr. Zipper. Both MCI and Dr. Zipper presented extensive testimony and evidence regarding Dr. Zipper's patient care at MCI, his mental health status, and his relations with other hospital employees and physicians. MEC presented expert testimony on arthroscopic surgery by Dr. Jelley, an orthopedic surgeon on MCI's medical staff and a member of the ad hoc committee of the Department of Surgery, and Dr. William C. Allen, Chairman of the Division of Orthopedics at the University of Missouri–Columbia. MEC submitted written reports of committee members, Dr. Allen and Dr. Wertzberger. Dr. Zipper presented the testimony of Dr. George H. Woy, an orthopedic surgeon in private practice, and Dr. James Hamilton, Chairman of Orthopedic Surgery at the University of Missouri–Kansas City. Dr. Zipper submitted written reports by Dr. Gross and Dr. Roger Hood.

MEC presented evidence that ligament injury can be diagnosed with more than 90% accuracy by an experienced clinician performing a physical examination of a patient and relying on non-invasive tests, including a manual examination, instrumented measurement and stress radiographs. Dr. Zipper, however, relied for diagnosis on invasive, surgical arthroscopy that required the patient be under a general anesthetic. Dr. Zipper would then discuss his findings with the patient and operate to correct detected problems, resulting in multiple, unnecessary surgeries. MEC's experts also criticized Dr. Zipper's repeat surgeries to address post-arthroscopic bleeding, failure to regain motion and post-operative synovitis because these complications or conditions could be resolved without additional surgery. Finally, MEC's experts testified that Dr. Zipper's incidence of plica resections, 15.7% to 21%, was too high. Of the twenty-one knee surgeries under review, evidence was submitted that at least eleven were unnecessary or should have been combined with other procedures.

MEC presented additional evidence regarding the back surgeries performed by Dr.

Zipper. Dr. James A. Stuckmeyer, an orthopedic surgeon on the medical staff and a member of the ad hoc Committee of the Department of Surgery, and Dr. Allen testified. MEC submitted the written reports of the ad hoc committee and Dr. Allen. MEC's experts criticized the adequacy of Dr. Zipper's pre-operative work and indications for back surgery. The ad hoc committee's witnesses testified that Dr. Zipper performed more surgery than necessary. If surgical indications and technical execution are appropriate, the success rate for disc surgery should be 85% to 96%. Of the fourteen back cases under review by MEC, Dr. Zipper's success rate was 36%. Dr. Zipper's overall complication rate for back surgery was 26% compared with 3% for other spine surgeons.

Dr. Zipper presented the testimony of Dr. Hamilton and Dr. W. Joseph Ketcherside, a neurosurgeon on staff at MCI, and submitted written reports by Dr. Ketcherside and Dr. Roger P. Jackson to refute the testimony of MEC's experts regarding the back surgeries he performed. Dr. Ketcherside reviewed thirty-six of Dr. Zipper's laminectomy cases to determine whether the diagnostic evaluation was appropriate, the treatment was appropriate and performed to acceptable standards and whether an excessive incidence of complications was occurring. Dr. Ketcherside concluded that the cases did not demonstrate a failure to attain the accepted standard of care. Dr. Jackson reviewed the same thirty-six laminectomy cases and concluded that Dr. Zipper's diagnostic evaluations and his treatment, pre-operatively, intra-operatively and post-operatively, met medically acceptable standards. Dr. Hamilton disagreed with the opinion of Dr. Allen, who testified for MEC that Dr. Zipper should not have performed arthroscopy procedures for the sole purpose of evaluation, but stated that Dr. Zipper should have counseled his patients and obtained permission to proceed with reconstructive surgery if indicated by the arthroscopy. Dr. Hamilton concluded that Dr. Zipper was properly responding to his patients' needs.

Dr. Zipper's mental health was also at issue in the hearing. MEC presented evidence that Dr. Zipper was diagnosed with acute situational psychosis (atypical), totally unresolved, borderline personality disorder with dependent and narcissistic features, high level, and possible atypical bipolar disorder. Dr. Zipper had taken psychotropic medications for his conditions and was hospitalized in 1989 after a brief incidence of reactive psychosis. During certain periods of time, Dr. Zipper was unable to practice medicine due to his mental health problems. Under the policies of the State Board of Registration, a physician who has been hospitalized, is on medication for a psychiatric illness or who has been unable to function is subject to having his license placed on probation and can be required to file quarterly reports.

Dr. Eikermann prepared a psychiatric report on behalf of Dr. Zipper with a detailed description of Dr. Zipper's mental health diagnosis and treatment. Dr. Eikermann did not think Dr. Zipper had a mental disorder or impairment that might impact his clinical judgment or ability to provide safe and competent patient care. Dr. Eikermann declined to comment on an incident where Dr. Zipper "deliberately directed the contaminated liquid irrigation stream from an arthroscope cannula into the face and eyes of a hospital staff member" as he was not present during the incident. Dr. Eikermann noted Dr. Zipper recognized his reaction to the situation was inappropriate and believed the behavior would not be repeated. Dr. Eikermann finally opined that while Dr. Zipper's mental disorder might hurt his interactions with hospital employees and medical staff members, it would not interfere with his patient care.

Dr. Zipper also filed an affidavit to refute MEC's allegations of substandard patient care. Dr. Zipper stated that SEC and MEC instituted inquiries regarding Dr. Zipper's surgical practices and personal relationships with employees and staff at MCI but did not provide him notice as required by section 13.7–3 of the bylaws; MEC failed to give him notice of regular department, service and committee meetings where his clinical treatment was discussed; his prior cases had passed MCI's quality assurance standard; the knee arthroscopies and laminectomies performed by him at MCI were necessary

operations and performed within the acceptable standard of care; no patient, staff member or hospital employee had ever filed a formal complaint against him; he worked cooperatively with other members of the health care team and was not disruptive to hospital operations; he did not compromise quality patient care; his medical staff privileges at MCI were essential to the optimal provision of orthopedic surgical services and care to patients in Independence because MCI was the largest and best equipped hospital in Independence; and revocation of his privileges would significantly impair to ability to practice orthopedic medicine and surgery and to earn a living.

After consideration of the above evidence, the MCI Board of Directors revoked Dr. Zipper's staff privileges on February 19, 1992.

While the peer review process of Dr. Zipper was occurring, Dr. Zipper entered into a lease with MCP, a wholly-owned subsidiary of MCI, in January, 1989, to rent medical office space in the Parkway Medical Building for his practice. Mr. Kaseff, MCI's chief executive officer, orally promised to sell the building to Dr. Zipper for its fair market value if he renovated and improved it. Mr. Kaseff promised Dr. Zipper a credit toward the purchase price for any sums Dr. Zipper expended on renovation. Mr. Kaseff represented to Dr. Zipper that MCI controlled MCP because MCP was MCI's wholly-owned subsidiary and MCI could cause MCP to sell Dr. Zipper the medical building. In reliance on Mr. Kaseff's promise, Dr. Zipper expended approximately $125,000 renovating the building. MCI co-signed a note with Dr. Zipper to borrow $85,000 to finance the renovations. The renovations done by Dr. Zipper improved the value of the building from $150,000 to between $230,000 and $270,000. Mr. Kaseff actively participated in the negotiating and remodeling process with Dr. Zipper. MCI presented Dr. Zipper with a proposed real estate contract, a proposed right of first offer agreement and a proposed option to purchase agreement in May and June of 1990. MCI and MCP then refused to sell Dr. Zipper the building at its fair market value. As a result, Dr. Zipper refused to pay MCP the rent due on the building. MCP filed a federal diversity action for rent and possession against Dr. Zipper in 1992.

Dr. Zipper filed a bankruptcy petition which stayed the rent and possession action. MCP and Dr. Zipper subsequently entered into a Stipulation to Judgment for Possession and Stay of Execution. The stipulation stated that "[t]he debtor [Dr. Zipper] reserves . . . any and all claims for monetary damages debtor may possess or alleged [sic] to possess against the Creditor, Medical Center Park, Incorporated, or any parent or affiliated corporation, including Medical Center of Independence." After the stipulation was entered, MCP filed a motion for contempt to enforce the order in June, 1995. These federal proceedings became the basis of the trial court's entry of summary judgment as to Counts III and IV of Dr. Zipper's petition, which related to the alleged agreement between Dr. Zipper and MCI concerning the renovation and sale of the Parkway Medical Building.

As a result of the dispute over the sale of the Parkway Medical Building and due to the revocation of his staff privileges at MCI, Dr, Zipper and Independent Orthopedics and Sports Medicine, P.C., filed this action. In Count I of the petition, Dr. Zipper alleged that MCI breached its contract with Dr. Zipper by revoking his medical staff privileges without following the provisions of the hospital bylaws and by acting in bad faith and with malice. In Count II, Appellants alleged that MCI, Health Midwest, the members of MCI's Medical Executive Committee, the members of MCI's Board of Directors, the members of the Collins Group, Mr. Kaseff and Mr. Christiansen illegally conspired to deprive Dr. Zipper of his staff privileges in violation of Missouri's antitrust laws. In Count III, Appellants asserted a claim of promissory estoppel against MCI, MCP, Mr. Kaseff and the members of MCI's Board of Directors because MCI and MCP breached the oral promise to sell Appellants the Parkway Medical Building after Appellants acted in reliance on that promise. In Count IV, Appellants claimed a conspiracy to commit the tort of fraudulent misrepresentation in that MCI, MCP, Mr. Kaseff and members of

MCI's Board of Directors conspired to induce Dr. Zipper to make improvements to MCP's office building while intending to defraud him by not paying for those improvements and repairs.[5]

Respondents filed motions for summary judgment on Counts I–IV of Appellant's petition. The trial court entered summary judgment in favor of Respondents on the breach of contract claim contained in Count I and the civil conspiracy and antitrust claims contained in Count II. The trial court found that Appellants failed to state a cause of action. Count III and Count IV, based on promissory and fraudulent misrepresentation, were summarily adjudicated due to Dr. Zipper's failure to file a compulsory counterclaim in the prior federal actions between Dr. Zipper and MCP. This appeal followed.

### STANDARD OF REVIEW

Appellate review of the grant of summary judgment is reviewed *de novo. ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). The record is viewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.*

Summary judgment will be upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. Facts asserted in affidavits or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* A defending party may establish a right to judgment as a matter of law by showing any one of the following: (1) facts that negate any one of the elements of the claimant's cause of action; (2) the non-movant, after an adequate period of discovery, has not and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *Id.* at 381.

Once the movant has established a right to judgment as a matter of law, the non-movant must show that one or more of the material facts shown by the movant not to be in dispute is, in fact, genuinely disputed. *Id.* The non-moving party may not rest upon the mere allegations and denials of the pleadings but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.; Reeves v. Keesler,* 921 S.W.2d 16, 19 (Mo.App.1996). A genuine dispute is one that "is real, not merely argumentative, imaginary or frivolous." *ITT,* 854 S.W.2d at 382. If the record contains competent evidence that two plausible, but contradictory accounts of essential facts exist, then a genuine issue of material fact remains to be resolved. *Bickerton, Inc. v. American States Ins. Co.,* 898 S.W.2d 595, 600 (Mo.App.1995). A question of fact exists when "fairminded people, exercising reasonable judgment could reach different conclusions on the issue in controversy." *Nieberg v. Marshall,* 865 S.W.2d 409, 410 (Mo.App.1993).

### APPELLANT'S FAILURE TO COMPLY WITH RULE 74.04(c)(2) DOES NOT RESULT IN ALL FACTS ASSERTED IN RESPONDENTS' MOTIONS FOR SUMMARY JUDGMENT BEING DEEMED ADMITTED

Respondents argue that Appellants failed to comply with Rule 74.04(c)(2) in their responses to motions for summary judgment, and, hence, Appellants should be deemed to have admitted the facts alleged by Respondents in their motions. Rule 74.04(c)(2) governs responses to summary judgments. It provides:

> Within thirty days after a motion for summary judgment is served, the adverse party shall serve a response on all parties, and, if the adverse party is relying on affidavits, the response shall have attached thereto affidavits not previously filed. The response shall admit or deny each of the

---

5. Counts V and VI of Appellant's petition are not the subject of this appeal. Count V was voluntarily dismissed. Count VI against Nicholas Di- Sette was severed by the trial court and is still pending.

movant's factual statements in numbered paragraphs that correspond to movant's numbered paragraphs, shall state the reason for each denial, shall set out each additional material fact that remains in dispute, and shall support each factual statement asserted in the response with specific references to where each such fact appears in the pleadings, discovery or affidavits. The response may also have attached thereto a legal memorandum explaining why summary judgment cannot be granted. If the party opposing a motion for summary judgment has not had sufficient time to conduct discovery on the issues to be decided in the motion for summary judgment, such party shall file an affidavit describing the additional discovery needed in order to respond to the motion for summary judgment and the efforts previously made to obtain such discovery. For good cause shown, the court may continue the motion for summary judgment for a reasonable time to allow the party to complete such discovery.

RULE 74.04(c)(2). Respondents argue Appellants' responses to the motions for summary judgment fail to comply with Rule 74.04(c)(2) in that the responses (1) fail to admit or deny each of movant's factual statements in numbered paragraphs which correspond to the movant's numbered paragraphs; (2) fail to state the reason for each denial or set out each material fact which remains in dispute; and (3) fail to include factual statements with specific references to where each such fact appears in the pleadings, discovery or affidavits.

While Respondents are correct in their contention that Appellants' responses to the motions for summary judgment fail to comply with Rule 74.04(c)(2), contrary to Respondents' assertion, that failure does not result in all facts asserted in Respondents' motions for summary judgment being deemed admitted. Respondents do not cite, and legal research has failed to uncover, cases holding that failure to comply with Rule 74.04(c)(2) results in all facts asserted in motions for summary judgment being deemed admitted. The general rule of law is that, when considering the appeal from the order granting summary judgment, facts set forth by affidavit or otherwise in support of the moving party's motion are taken as true unless contradicted by nonmoving party's response to the summary judgment motion. *Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935, 938 (Mo.App.1996); *Nigro v. Research College of Nursing*, 876 S.W.2d 681, 685 (Mo.App.1994). Applying this general principle of law, only those facts in Respondents' motions for summary judgment that Appellants' did not contradict will be deemed admitted. Accordingly, Respondents' contention that all facts alleged in their motions for summary judgment should be accepted as true fails.

### POINT I

As Appellants first issue on appeal, they contend that the trial court erred by granting summary judgment on Counts III and IV of the petition in favor of MCI, MCP, Mr. Kaseff and eight members of MCI's Board of Directors. The trial court granted summary judgment on Count III, a promissory estoppel claim and unjust enrichment claim, and Count IV, a fraudulent misrepresentation claim, finding that Dr. Zipper was precluded from raising these issues due to his failure to file compulsory counterclaims in prior federal proceedings between the parties. Appellants argue that they were not compelled to file counterclaims because their claims against Respondents were preserved through the stipulation entered into by the parties. Appellants further argue that they have adduced sufficient evidence to defeat summary judgment on Counts III and IV.

■ Counts III and IV purport to state a claim for both Dr. Zipper and Independent Orthopedics and Sports Medicine, P.C. All factual allegations, however, pertaining to the elements of promissory estoppel and fraudulent misrepresentation refer only to Dr. Zipper. Accordingly, the Independent Orthopedics and Sports Medicine, P.C. was not a proper party to Counts III and IV and, therefore, the trial court did not err in granting summary judgment against Independent Orthopedics and Sports Medicine, P.C. on Counts III and IV.

■ Whether the trial court erred in granting summary judgment against Dr. Zipper on Counts III and IV is next determined. In determining the propriety of the grant of summary judgment, whether Dr. Zipper is precluded from raising the issues in Counts III and IV due to the federal proceedings between the parties is first determined. In reaching this determination, whether the stipulation between the parties that provided that all claims for monetary damages against MCI and MCI were preserved is valid is first examined. "A stipulation is an agreement between counsel with respect to business before a court and is not one of the usual pleadings, but is a proceeding in the cause and as such is under the supervision of the court." *Pierson v. Allen*, 409 S.W.2d 127, 130 (Mo.1966). Stipulations are "controlling and conclusive, and courts are bound to enforce them." *Id.* Stipulations are interpreted in view of the result which the parties were attempting to accomplish. *Landers v. Smith*, 379 S.W.2d 884, 888 (Mo.App.1964)

In *Landers*, the court held that the plaintiff's failure to assert a compulsory counterclaim in defendant's previous action arising out of an automobile collision did not bar the plaintiff's subsequent action where the first action was dismissed on stipulation before judgment. *Id.* at 888. There, Landers, the plaintiff, and Smith, the defendant, were involved in an automobile accident. *Id.* at 885. Smith instituted an action against Landers that was subsequently dismissed by stipulation. *Id.* The stipulation provided that the dismissal of the action against Landers would not later bar his "rights and causes of action." *Id.* at 886. When Landers later brought suit against Smith for his injuries from the same accident, Smith argued that Lander's failure to plead his action as a compulsory counterclaim in the first action filed by Smith necessitated dismissal of Lander's suit. *Id.* The court, while acknowledging that Lander's action constituted a compulsory counterclaim under Rule 55.45(a), disagreed. *Id.* at 887. The court reasoned:

> Stipulations varying or altering trial procedure, or waiving the benefit of procedural statutes, have been consistently enforced by our courts in the absence of any claim

of fraud, duress or mistake, and we can perceive no sound reason why [Smith] should not now be held to what she has stipulated.

*Id.* at 888; *see also Pierson*, 409 S.W.2d at 131 (enforcing parties' stipulation that a pending counterclaim would not be affected by the dismissal of the petition because the defendant had "expressly reserved" the right to continue the counterclaim).

■ Here, as in *Landers*, the stipulation between Dr. Zipper and MCP is enforceable. The stipulation between Dr. Zipper expressly reserved Dr. Zipper's right to "any and all claims for monetary damages [Dr. Zipper] may possess or alleged [sic] to possess against the Creditor, Medical Center Park, Incorporated, or any parent or affiliated corporation, including Medical Center of Independence." The stipulation was recognized and approved by the bankruptcy court and was the basis for the judgment in the rent and possession action just as the stipulation in *Landers* was recognized and approved by the trial court. Because the stipulation specifically reserved Dr. Zipper's rights to future monetary claims against MCP and MCI and was approved by the bankruptcy court, the stipulation between Dr. Zipper and MCP and MCI is enforceable just as the stipulation in *Landers* was enforceable. Dr. Zipper, therefore, preserved his right to bring the present claims against defendants MCI and MCP.

The finding that Dr. Zipper preserved his right to bring suit against MCI and MCP is not incompatible with the court's decision in *Evergreen Nat'l Corp. v. Killian Constr.*, 876 S.W.2d 633 (Mo.App.1994), a case relied on by Respondents for the proposition that parties may not waive compulsory counterclaims by stipulation. In *Evergreen*, the court held that a choice-of-forum clause in a contract did not relieve the parties from the necessity of bringing a compulsory counterclaim under Rule 55.32. *Id.* at 635. The court reasoned that "there is no authority for the proposition that parties may waive compulsory counterclaims or other procedural matters which affect judicial economy rather than the parties' due process rights." *Id.* The broad prin-

ciple enunciated in *Evergreen*, however, is not controlling where a court-approved stipulation, rather than a private contract between the parties, is at issue. In *Pierson*, the Missouri Supreme Court approved the principle that stipulations reserving the right to file compulsory counterclaims in subsequent proceedings are binding on the court. *Pierson*, 409 S.W.2d at 130. Accordingly, the stipulation between Dr. Zipper and MCI and MCP is enforceable and Dr. Zipper is not barred from bringing this action.

■ Having determined that Dr. Zipper was not barred from bringing Count III and IV, whether Dr. Zipper adduced sufficient evidence to defeat summary judgment on those counts is next determined. In Count III, Dr. Zipper pleaded causes of action premised on promissory estoppel and unjust enrichment. Accordingly, whether Dr. Zipper adduced sufficient evidence to establish Respondents' liability under the theory of promissory estoppel and/or unjust enrichment is determined.

■ Promissory estoppel, is a form of equitable estoppel that arises from a representation made by a party which is reasonably relied upon by the other party who is injured as a result of the reliance. *Resnik v. Blue Cross and Blue Shield*, 912 S.W.2d 567, 572–73 (Mo.App.1995) (quoting *Peerless Supply Co. v. Industrial Plumbing and Heating Co.*, 460 S.W.2d 651, 666 (Mo.1970)). Promissory estoppel has these specific elements: (1) promise; (2) on which a party relies to his detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice which only enforcement of the promise could cure. *Response Oncology, Inc. v. Blue Cross & Blue Shield of Mo.*, 941 S.W.2d 771, 778 (Mo.App.1997); *McCoy v. Spelman Mem'l Hosp.*, 845 S.W.2d 727, 730 (Mo.App.1993). The promise giving rise to the cause of action must be definite, and the promise must be made "in a contractual sense." *Prenger v. Baumhoer*, 939 S.W.2d 23, 26 (Mo.App.1997). Estoppel is not a favorite of the law and each element must clearly appear and be proven by the party seeking its enforcement. *Farmland Industries, Inc. v. Bittner*, 920 S.W.2d 581, 583 (Mo.App.1996). Essential to the assertion of estoppel is that the promisor should have expected or reasonably foreseen the action which the promisee took in reliance on the promise. *Otten v. Otten*, 632 S.W.2d 45, 49 (Mo.App.1982).

Dr. Zipper has adduced sufficient evidence to establish elements (1)-(3) of his promissory estoppel claim. Promissory estoppel first requires that a promise was made. Dr. Zipper has created an issue of material fact by the statement in his affidavit that Mr. Kaseff promised him that MCP would sell the Parkway Medical Building to him if he improved it. The second element of promissory estoppel, detrimental reliance, is also satisfied. Dr. Zipper presented numerous exhibits establishing that he expended approximately $125,000 renovating the building in reliance on Mr. Kaseff's representation. Finally, Dr. Zipper has adduced evidence that MCI reasonably should have or did, in fact, foresee Dr. Zipper's renovation of the building in reliance on Mr. Kaseff's promise. MCI cosigned the note with Dr. Zipper in order to facilitate Dr. Zipper's acquiring the funds to renovate the building. Additionally, letters introduced into evidence by Dr. Zipper showed that Mr. Kaseff was actively involved in the renovation process. Dr. Zipper, therefore, adduced sufficient evidence to satisfy elements (1)-(3) of promissory estoppel.

■ Dr. Zipper, however, must also satisfy the final factor required for application of promissory estoppel, that failure to enforce the contract would result in injustice. The Restatement (Second) of Contracts, Sec. 139(2) (1981), states:

> In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:
>
> (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
>
> (b) the definite and substantial character of the action or forbearance in relation to the remedy sought;
>
> (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the

making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; (e) the extent to which the action or forbearance was foreseeable by the promisor.

Of the factors considered under the Restatement, the adequacy and availability of a remedy at law is most significant. The rationale behind emphasis on factor (a) results from the nature of promissory estoppel. Promissory estoppel is a form of equitable relief. *Resnik*, 912 S.W.2d at 572–73. Generally, equity will not intercede if an adequate remedy at law exists. *Hammons v. Ehney*, 924 S.W.2d 843, 847 (Mo.1996); *State ex rel. General Dynamics Corp. v. Luten*, 566 S.W.2d 452, 460 (Mo. banc 1978); *Harris v. State Bank and Trust Co. of Wellston*, 484 S.W.2d 177, 179 (Mo.1972); *Umphres v. J.R. Mayer Enterprises, Inc.*, 889 S.W.2d 86, 90 (Mo.App. 1994).

Here, Dr. Zipper has other remedies at law available that would adequately compensate his injury and, therefore, he has failed to establish the final element required for application of promissory estoppel: that injustice can only be avoided by enforcement of the promise. Dr. Zipper is not seeking specific enforcement of the promise made to him by MCI which is the remedy for a claim of promissory estoppel. Instead, Dr. Zipper seeks restitution from MCI for the expenditure of $125,000 he made in renovations to the building. As restitution is a legal remedy, an adequate remedy at law exists and, thus, equitable relief is not appropriate.[6] The trial court, therefore, did not err in entering summary judgment in favor of MCI on Dr. Zipper's claim in Count III premised on the doctrine of promissory estoppel.

■■■■■ Dr. Zipper, however, also stated a theory of recovery in Count III premised on unjust enrichment. "Unjust enrichment occurs where a benefit conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust." *Employ-*

ers Ins. of Wausau v. Crane Co.*, 904 S.W.2d 460, 462 (Mo.App.1995) (quoting *Erslon v. Vee–Jay Cement Contracting Co.*, 728 S.W.2d 711, 713 (Mo.App.1987)). To avoid unjust enrichment, courts allow a theory of recovery under the doctrine of quasi contract, also known as a contract implied in law. *Id.* The essential elements of a quasi-contract are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable. *Id.* For a quasi-contract based upon unjust enrichment, "the amount of the recovery is not the actual amount of the enrichment, but the amount of the enrichment which, as between the two parties, would be unjust for one party to retain." *Johnson Group, Inc. v. Grasso Bros., Inc.*, 939 S.W.2d 28, 30 (Mo.App.1997) (quoting *Patrick V. Koepke Const., Inc. v. Woodsage Const. Co.*, 844 S.W.2d 508, 516 (Mo.App.1992)). For a quasi-contract based upon quantum meruit, "the measure of recovery is the reasonable value of the goods or services furnished to the benefitted defendant." *Id.* While quantum meruit offers a different remedy, it is based primarily on the principle of unjust enrichment. *Johnson*, 939 S.W.2d at 30 (citing *International Paper Co. v. Futhey*, 788 S.W.2d 303, 306 (Mo.App.1990)).

■■■■ Dr. Zipper has adduced sufficient facts to defeat summary judgment on the theory of unjust enrichment. First, Dr. Zipper presented evidence that he conferred a benefit on MCP and MCI that was accepted and retained by them. Dr. Zipper obtained an estimate from Schemata, an interior design company, advising him that the renovations to the Parkway Medical Building would cost $80,000. Dr. Zipper obtained financing for the renovations by borrowing $85,000 on a note MCI co-signed. Mr. Kaseff was actively involved in the renovation process. In total, Dr. Zipper expended approximately $125,000 renovating the Parkway Medical Building. Dr. Zipper introduced evidence

---

6. Because Dr. Zipper has failed to adduce evidence establishing the appropriateness of equitable relief, whether Dr. Zipper adduced evidence to satisfy factors (b)–(e) of the Restatement need not be determined.

establishing that the building was worth $150,000 before the renovations and between $230,000 and $270,000 after the renovations. This evidence established that Dr. Zipper conferred a benefit on MCP and MCI and that these parties were aware of the benefit and accepted and retained the benefit.

The acceptance and retention by MCI and MCP of the improvements of the Parkway Medical Building and their subsequent refusal to sell the building to Dr. Zipper or compensate him for the renovations establish circumstances in which retention without payment would be inequitable and, thus, Dr. Zipper has established the last element required for application of the doctrine of unjust enrichment. MCI and MCP received a substantial benefit when Dr. Zipper renovated the medical building in that the building greatly appreciated in value as a result of the renovations. To allow MCI and MCP to retain the benefit of the renovations without compensating Dr. Zipper for his efforts would unjustly enrich MCI and MCP. The trial court, therefore, erred by entering summary judgment on Count III because there is a genuine issue of material fact as to whether MCI and MCP were unjustly enriched by Dr. Zipper's actions.

▪ Dr. Zipper stated a cause of action against defendants MCI, MCP, Mr, Kaseff and the eight members of MCI's Board of Directors in Count III. MCI and MCP, however, are separate legal corporations. Whether Dr. Zipper adduced sufficient evidence to pierce MCP's corporate veil to hold MCI accountable on an unjust enrichment claim is, therefore, determined. Normally, a parent corporation is not responsible for the acts of its subsidiary corporation; the exception to this rule is where the wronged party pierces the corporate veil. *Grease Monkey Intern., Inc. v. Godat,* 916 S.W.2d 257, 262 (Mo.App.1995). To pierce the corporate veil, a plaintiff must show:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Sansone v. Moseley,* 912 S.W.2d 666, 669 (Mo.App. W.D.1995).

▪ Dr. Zipper adduced sufficient evidence to pierce MCP's corporate veil to hold MCI accountable on an unjust enrichment claim. MCP is a wholly-owned subsidiary of MCI. Dr. Zipper presented evidence that Mr. Kaseff represented to him that MCI controlled MCP because MCP was MCI's wholly-owned subsidiary and, therefore, MCI could cause MCP to sell Dr. Zipper the medical building. Mr. Kaseff's representation is supported by additional evidence; MCI incurred a substantial financial liability when it co-signed the note with Dr. Zipper in order to allow Dr. Zipper to obtain financing for the renovations to the medical building. Additionally, Mr. Kaseff actively participated in the negotiating and renovation process with Dr. Zipper. The evidence that Mr. Kaseff participated in the renovation process and that MCI financed renovations on a building owned by MCP supports Dr. Zipper's allegation that he was induced to make improvements to MCP's building without compensation. Finally, MCI and MCP share common directors and officers which weighs in favor of piercing the corporate veil. *Dave Kolb Grading, Inc. v. Lieberman Corp.,* 837 S.W.2d 924, 936 (Mo.App.1992). This evidence established a genuine issue of material fact whether MCI dominated MCP's finances and its business practices with respect to the renovations on the building in order to perpetrate a fraud on Dr. Zipper by causing him to expend $125,000 improving the buildings with no compensation. The evidence, therefore, established a genuine issue of material fact of whether MCI was the alter ego of MCP so as to pierce the corporate veil and make MCI liable for MCP's misdeeds.

The liability of Mr. Kaseff and the eight members of MCI's Board of Directors on Dr. Zipper's unjust enrichment claim is finally determined. In Missouri, merely holding a corporate office will not subject one to personal liability for the misdeeds of the corporation. *Grothe v. Helterbrand,* 946 S.W.2d 301, 304 (Mo.App.1997); *Boyd v. Wimes,* 664 S.W.2d 596, 598 (Mo. App.1984). However, "corporate officers may be held individually liable for tortious corporate conduct if they have actual or constructive knowledge of, and participated in, an actionable wrong." *Grothe,* 946 S.W.2d at 304 (citing *Lynch v. Blanke Baer & Bowey Krimko, Inc.,* 901 S.W.2d 147, 153 (Mo.App. 1995)). Dr. Zipper has failed to adduce any evidence establishing that the members of the Board of Directors had actual or constructive knowledge of Mr. Kaseff's promise to Dr. Zipper regarding the Parkway Medical Building. The Board of Directors, therefore, cannot be held personally liable for the actions of MCI or MCP. Furthermore, although Mr. Kaseff participated in the asserted wrong committed by MCI and MCP, Dr. Zipper has failed to establish that Mr. Kaseff received a personal benefit from the renovations to the medical building to warrant imposition of personal liability under an unjust enrichment theory. *Employers Ins. of Wausau,* 904 S.W.2d at 462. The trial court, therefore, did not err in granting summary judgment in favor of Mr. Kaseff and the members of the Board of Directors. Accordingly, the trial court's judgment on Count III with respect to the MCI Board members and Mr. Kaseff is affirmed. The decision of the trial court granting summary judgment in favor of defendants MCI and MCP is reversed, and the case is remanded for further proceedings consistent with this opinion.

Whether the trial court erred by granting summary judgment on Count IV of Dr. Zipper's petition is next determined. In Count IV, Dr. Zipper alleged that MCI, Mr. Kaseff, MCP and the eight members of MCI's Board of Directors wrongfully and fraudulently conspired to defraud him by inducing him to make extensive repairs and renovations to the Parkway Medical Building without compensation. A party suing in tort for fraudulent misrepresentation must establish the following nine elements:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) the speaker's intent that the representation should be acted on by the hearer in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) his right to rely thereon; and (9) the hearer's consequent and proximately-caused injuries.

*Groothand v. Schlueter,* 949 S.W.2d 923, 927 (Mo.App.1997); *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 371 (Mo.App.1996). Although fraud may be established by circumstantial evidence, plaintiffs' case will fail if they can show only facts and circumstances which are equally consistent with honesty and good faith. *Meyer v. McGarvie,* 856 S.W.2d 904, 907 (Mo.App.1993) (citing *Bank of Kirksville v. Small,* 742 S.W.2d 127, 131 (Mo. banc 1987)). To make a submissible case, plaintiff must adduce evidence to establish each of the nine elements. *Id.*

Dr. Zipper has failed to satisfy his burden of providing evidence that MCI's representation that it would sell him the Parkway Medical Center was false at the time it was made in 1989 and that the speaker knew of the falsity of the representation and, therefore, may not maintain his fraudulent misrepresentation action. The evidence established that MCI presented Dr. Zipper with a proposed real estate contract, a proposed right of first offer agreement and a proposed option to purchase agreement in May and June of 1990. That MCI presented Dr. Zipper with documents evincing an intent to proceed with the sale of the medical building refutes Dr. Zipper's contention that MCI's representation that it would sell him the medical building was false. Additionally, Dr. Zipper acknowledged in his petition that MCI decided to not sell Dr. Zipper the building after an appraisal of the facility showed a greatly increased value as a result of the renovation. Because the renovation occurred after 1989 when the offer was first made and the documents in evidence established MCI intended to proceed with the sale in 1989 and

1990 when the representations to sell the building were made, Dr. Zipper has failed to adduce evidence establishing the requisite falsity. The trial court, therefore, did not err in granting summary judgment on Count IV.

The decision of the trial court granting summary judgment on Count II is affirmed as to the MCI board members and Mr. Kaseff and is reversed as to MCI and MCP. The summary judgment on Count IV is affirmed.

## POINT II

As Dr. Zipper's second point on appeal, he contends that the trial court erred in granting summary judgment in favor of MCI on Count I because genuine issues of material fact exist concerning whether MCI breached its contract with Dr. Zipper.[7] Dr. Zipper argues that a valid contract existed between himself and MCI because he applied for, was granted and exercised orthopedic staff privileges at MCI; the then existing bylaws constitute a part of the contract; and, therefore, MCI was bound by the bylaws governing MCI's relationship with its medical staff. Dr. Zipper bases his argument that a contract exists between himself and MCI on bylaw § 14.2, entitled "Authorizations and Conditions," which states:

By applying for, or exercising, clinical privileges or providing specified patient care services within this Hospital, a practitioner:

A. authorizes representatives of the Hospital, and the Medical Staff to solicit, provide and act upon information bearing on his professional ability and qualifications;

B. agrees to be bound by the provisions of this ARTICLE and waives all legal claims against any representative who acts in accordance with the provisions of this ARTICLE; and

C. acknowledges that the provisions of this ARTICLE are express conditions to his application for, or acceptance of, staff membership, or his

exercise of clinical privileges or provision of specified patient services at this Hospital.

Dr. Zipper argues that genuine issues of material fact remain as to whether MCI breached its contract with him by (1) conducting the peer review process in bad faith; (2) revoking his staff privileges where the revocation was unreasonable; (3) failing to give him adequate notice of the regular meetings where his clinical course of treatment was discussed; (4) failing to give him a statement of the issues involved; and (5) disseminating confidential information regarding the peer review to persons not involved in the peer review process.

Whether hospital bylaws constitute a contract between a hospital and the medical staff defining the rights and obligations of the parties is an issue of first impression in Missouri. *See State ex rel. Willman v. St. Joseph Hosp.*, 684 S.W.2d 408, 410–11 (Mo. App.1984) (holding that doctor whose privileges were revoked at hospital was afforded procedures provided for in corporate and medical staff bylaws and, thus, it need not be determined whether hospital bylaws could constitute a binding contract between hospital and medical staff); *see also Davis v. Human Development Corp., Inc.*, 887 S.W.2d 638, 639 (Mo.App.1994) (holding that former employees of the Department of Health and Human Services and Human Development Corporation lacked contractual employment relationship with Department and, thus, could not maintain unlawful termination of employment action because "[t]he bylaws alone do not create a contract"). The jurisdictions that have addressed this issue are split. *See* John Hulston et. al., *Do Hospital Medical Staff Bylaws Create a Contract?*, 51 J. Mo. B. 352 (Nov./Dec.1995) (discussing various approaches in jurisdictions concerning whether hospital bylaws constitute binding contract between medical staff and hospital). The majority of jurisdictions hold that hospital bylaws are binding enforceable contracts once they are approved and adopted by the hospital's governing board. *See, e.g., Pariser v. Christian Health Care Sys.*, 816 F.2d 1248, 1251 (8th Cir.1987); *Lawler v.*

---

7. Count I of Appellant's petition involves only plaintiff Dr. Zipper and defendant MCI.

*Eugene Wuesthoff Memorial Hosp. Ass'n,* 497 So.2d 1261, 1264 (Fla.Dist.Ct.App.1986); *Lewisburg Community Hosp. v. Alfredson,* 805 S.W.2d 756, 759 (Tenn.1991); *Miller v. Indiana Hosp.,* 277 Pa.Super. 370, 419 A.2d 1191, 1193 (1980). These jurisdictions reason that if the hospital were not bound by the bylaws, then essentially the bylaws would be meaningless. *See Munoz v. Flower Hosp.,* 30 Ohio App.3d 162, 507 N.E.2d 360, 364 (1985) (discussing approaches among various jurisdictions).

A substantial minority of jurisdictions, however, find that bylaws that are subject to the ultimate authority of the hospital do not constitute a binding agreement between the medical staff and the hospital. *See, e.g., Robles v. Humana Hosp. Cartersville,* 785 F.Supp. 989, 1003 (N.D.Ga.1992); *Balkissoon v. Capitol Hill Hosp.,* 558 A.2d 304, 308 (D.C.1989); *Stein v. Tri–City Hosp. Authority,* 192 Ga.App. 289, 384 S.E.2d 430, 433 (1989); *Munoz,* 507 N.E.2d at 365; *Todd v. Physicians & Surgeons Comm. Hosp.,* 165 Ga.App. 656, 302 S.E.2d 378, 383 (1983). These jurisdictions note that an enforceable contract requires mutually bargained for exchange of consideration. These jurisdictions reason that because hospitals have a preexisting legal duty to enact bylaws and enact bylaws without the input of the medical staff, there is no consideration or mutuality of obligation between the parties and, therefore, the hospital bylaws medical bylaws cannot constitute a contract. *See Munoz,* 507 N.E.2d at 364 (discussing approaches among various jurisdictions). Thus, these jurisdictions have concluded that "the hospital's obligation to act in accordance with its bylaws is independent of any contractual right of the doctor." *Robles,* 785 F.Supp. at 1001 (quoting *Balkissoon,* 558 A.2d at 308). Two of the courts holding that hospital bylaws cannot constitute a contract between the hospital and its medical staff, however, find that the medical staff may seek judicial review and request injunctive relief to force the hospital to comply with the procedures adopted in its bylaws. *Robles,* 785 F.Supp. at 1002 (N.D.Ga.1992); *Gianetti v. Norwalk Hosp.,* 211 Conn. 51, 557 A.2d 1249, 1256 (1989).

This court finds the minority approach is in accordance with Missouri law. In Missouri, the essential elements of a contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Hyatt v. Trans World Airlines, Inc.,* 943 S.W.2d 292, 296 (Mo.App.1997); *Shapiro v. Butterfield,* 921 S.W.2d 649, 652 (Mo.App.1996); *Cash v. Benward,* 873 S.W.2d 913, 916 (Mo.App.1994). A valid contract must include an offer, an acceptance and consideration. *Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661, 662 (Mo. banc 1988). "[A] promise to do that which one is already legally obligated to do cannot serve as consideration for a contract." *Wilson v. Midstate Industries, Inc.,* 777 S.W.2d 310, 314 (Mo.App.1989)(quoting *City of Bellefontaine Neighbors v. J.J. Kelley R. & B. Co.,* 460 S.W.2d 298, 301 (Mo.App. 1970)).

The hospital bylaws cannot be considered a contract under Missouri law because consideration is lacking. By state regulation, Missouri hospitals are required to "adopt bylaws, rules and policies governing their professional activities in the hospital." John Hulston et. al., *Do Hospital Medical Staff Bylaws Create a Contract?,* 51 J. Mo. B. 352, 354 (Nov./Dec.1995) (citing 19 C.S.R. § 30–20.021(2)(c)(1)). MCI, therefore, had a preexisting legal duty to adopt the bylaws independent of its relationship with Dr. Zipper. As noted by the court in *Wilson,* a promise to do that which a party is already legally obligated to do does not constitute valid consideration. Because MCI had a preexisting legal duty to the adopt the bylaws independent of its relationship with Dr. Zipper, consideration is lacking and, therefore, the bylaws cannot constitute a contract between MCI and Dr. Zipper.

Additionally, there is no bargained for exchange as to the procedures adopted in hospital bylaws as required to have an enforceable contract. *Robles,* 785 F.Supp. at 1002. Dr. Zipper did not have input in the bylaws nor did he have the power to change the bylaws. MCI had the right to unilaterally change the procedures set forth in the bylaws without consultation with anyone on the

medical staff and to impose those bylaws on its medical staff. Because no consideration existed, the hospital bylaws do not constitute a contract between Dr. Zipper and MCI.

The holding that hospital bylaws do not constitute a contract between the hospital and its medical staff is in accord with strong public policy principles in Missouri. The exclusion of a physician or surgeon from practicing in a private hospital is a matter that rests in the discretion of the managing authorities. *Richardson v. St. John's Mercy Hosp.*, 674 S.W.2d 200, 201 (Mo.App.1984). The grant of hospital privileges to a physician, therefore, does not confer on the physician absolute authority to practice medicine at that hospital. The hospital retains authority to restrict or revoke a staff member's privileges by reasonable and nondiscriminatory rules and regulations. Allowing a physician to seek damages for an alleged failure of a hospital to follow the procedures established by its bylaws is counter to this policy. A hospital's consideration, when terminating the privileges of a physician, of its potential liability for monetary damages could unduly impugn a hospital's actions in terminating the privileges of a physician providing substandard patient care. Because creating a breach of contract action would run counter to Missouri's expressed policy of assuring quality health care, public policy principles support the finding that the bylaws did not constitute a contract between MCI and Dr. Zipper.

While MCI utilizes contractual language in bylaw § 14.2 and, thereby, attempts to grant its medical staff certain rights and privileges, the contractual language found in bylaw § 14.2 has no force of law. If MCI wants to impose duties and incur obligations with its employees, it must do so in a separate document that is not the by-laws. Because MCI did not set forth the procedures established in the bylaws in a separate document, Dr. Zipper may not bring an action for breach of contract. Accordingly, because Dr. Zipper sought only contractual damages for MCI's alleged breach of its bylaws and contractual damages are not an available remedy for breach of hospital bylaws, Dr. Zipper has failed to state a cause of action in Count I.

The trial court, therefore, did not err in entering summary judgment in favor of MCI on Count I. Point two is denied.

## POINT III

As his final point on appeal, Appellants contend that the trial court erred by entering summary judgment in favor of Respondents on Count II which alleged a claim for civil conspiracy. To state a claim for civil conspiracy, a party must allege (1) an agreement or understanding; (2) between two or more persons; (3) to do an unlawful act or to do a lawful act by unlawful means. *Macke Laundry Serv. Ltd. v. Jetz Serv. Co.*, 931 S.W.2d 166, 175 (Mo.App.1996). Civil conspiracy is not actionable by itself because "some wrongful act must have been done by one or more of the alleged conspirators and the fact of a conspiracy merely bears on the liability of the various defendants and joint tortfeasors." *Id.* (quoting *Bockover v. Stemmerman*, 708 S.W.2d 179, 182 (Mo.App. 1986)). If the underlying claim does not state a cause of action, there can be no claim for civil conspiracy. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996). As the underlying claim for their civil conspiracy theory, Appellants argue that Respondents violated Missouri's Antitrust Law, §§ 416.011 to 416.161, RSMo 1994, and tortiously interfered with Dr. Zipper's contractual expectancy created by the hospital bylaws.

Whether Appellants adduced sufficient evidence to defeat summary judgment on the claim under the Missouri Antitrust Law is first examined. Section 416.031.1, RSMo 1994, provides that "[e]very contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful." § 416.031, RSMo 1994. In order to state a violation of section 416.031, a plaintiff must allege that (1) defendants contracted, conspired or combined with one another; (1) the conspiracy produced anticompetitive effects within the relevant geographic and product markets; (3) the goals of the conspiracy or combination as well as the conduct in furtherance of those goals were illegal; and (4) the plaintiff suffered injury as a result of the conspiracy. *Johnston v. Norrell Health Care, Inc.*, 835 S.W.2d 565, 568 (Mo.App.

1992). Section 416.031.1 is analogous to 15 U.S.C. Sec. 2 of the Sherman Act. Under directive of section 416.141, RSMo 1994, federal cases interpreting Sec. 2 control interpretation of alleged violations of section 416.031.1. § 416.141, RSMo 1994; *Defino v. Civic Center Corp.*, 718 S.W.2d 505, 510 (Mo. App.1986).

*Robles v. Humana Hosp. of Cartersville*, 785 F.Supp. 989 (N.D.Ga.1992), a federal district case involving an alleged violation of the Sherman Antitrust Act, is dispositive of Dr. Zipper's claim under Missouri Antitrust Law. In *Robles*, a staff physician whose privileges were terminated by a hospital brought action against the hospital and certain physicians alleging the hospital and the physicians conspired to monopolize the practice of obstetrics and gynecology in the county in violation of the Sherman Antitrust Act. *Id.* at 998. The court entered summary judgment in favor of the defendant hospital and physicians, finding that the plaintiff had failed to show an antitrust injury. *Id.* at 1003. The court reasoned:

> The harm alleged in the complaint is really only harm to the individual doctor and not to competition within the marketplace. 'Thus, reduced to its essentials, plaintiff['s] Sherman Act claims rest not on a showing of anti-competitive impact, but merely on the fact that [he] is [a] disappointed competitor who will now be forced to provide [obstetric] services elsewhere.' Without the necessary ingredient of anti-trust injury, a plaintiff cannot merely recite the mantra of antitrust jurisprudence and expect his allegations to magically establish a sufficient Sherman Act infringement case.

*Id.* at 999 (citing *Bellam v. Clayton County Hosp. Auth.*, 758 F.Supp. 1488, 1494 (N.D.Ga.1990)); *see also Johnston*, 835 S.W.2d at 568 (finding petition failing to allege that any of the alleged agreements between health care providers produced adverse, anticompetitive effects within relevant product or geographic market failed to state cause of action for conspiracy in restraint of trade).

■ Here, as in *Robles*, Appellants have failed to establish the requisite showing of an anti-competitive impact as required to state a claim under Missouri Antitrust Law. Appellants alleged in their petition that "the aforesaid combination and conspiracy of Defendants ... constituted an unreasonable and illegal combination in restraint of trade ..." Appellants, however, failed to produce any evidence to support this allegation. As in *Robles*, Appellants failed to adduce evidence establishing an anticompetitive effect in the relevant geographic and product markets due to MCI's revocation of Dr. Zipper's staff privileges. While Dr. Zipper stated in his affidavit that the revocation of his staff privileges at MCI substantially reduced and deterred business competition in the field of orthopedic surgery in the Independence area and at MCI, Dr. Zipper failed to allege any facts supporting his opinion that the revocation of his staff privileges resulted in an anticompetitive effect. As noted in *Robles*, Appellants cannot merely recite the existence of an antitrust injury and expect those allegations to create an issue of material fact over whether an antitrust violation occurred. Because Appellants failed to adduce evidence showing an antitrust injury, no issue of material fact was created just as the physician in *Robles* failed to create an issue of material fact by his unsupported allegations that he suffered an antitrust injury. The trial court, therefore, did not err in granting summary judgment against Appellants.

■ Whether Appellants adduced sufficient evidence to defeat summary judgment on their tortious interference claim is finally determined. Tortious interference with a contract or business expectancy requires (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. banc 1993). As discussed in Point II, *supra*, MCI's by-laws did not create a contractual relationship between MCI and Dr. Zipper. Appellants, therefore, must first show a valid business expectancy in order to maintain their tortious interference claim.

■ Whether Dr. Zipper adduced sufficient evidence to establish a valid business

expectancy in the continuation of his staff privileges at MCI, however, need not be determined because Dr. Zipper has failed to satisfy the remaining elements of tortious interference with a business expectancy. An action for tortious interference with a business expectancy will lie against a third party only. *Century Management, Inc. v. Spring,* 905 S.W.2d 109, 114 (Mo.App.1995); *White v. Land Clearance for Redevelopment Authority,* 841 S.W.2d 691, 695 (Mo.App.1992). Where the individual being sued is an officer or agent of the defendant corporation, the officer or agent acting for the corporation is the corporation for purposes of tortious interference. *Fields v. R.S.C.D.B., Inc.,* 865 S.W.2d 877, 879 (Mo.App.1993).

In support of his tortious interference claim, Dr. Zipper argues that he had a valid business expectancy in his continued employment at MCI. In Count II, Dr. Zipper named, *inter alia,* as defendants MCI, eight members of MCI's Board of Directors, the members of its MEC, Mr. Kaseff and Mr. Christiansen, in their capacities as chief executive officers of MCI and Dr. Jelley who was alleged to have acted as an agent of MCI. Because MCI's Board of Directors, the members of its MEC, Mr. Kaseff, Mr. Christiansen and Dr. Jelley were acting for MCI, they are MCI for purposes of Dr. Zipper's tortious interference claim. *Id.* As recognized by the court in *Century,* an action for tortious interference with business expectancy will not lie against a party to the relationship with which interference is alleged. Because Dr. Zipper premises his tortious interference claim on an alleged business expectancy with MCI, Dr. Zipper's action against MCI and the agents acting on its behalf-the eight members of MCI's Board of Directors, Mr. Kaseff and Mr. Christiansen, in their capacities as chief executive officers of MCI and Dr. Jelley-cannot be sustained. The trial court, thus, did not err in granting summary judgment in favor of MCI, the members of MCI's Board of Directors, the members of its MEC, Dr. Jelley, Mr. Kaseff and Mr. Christiansen.

Dr. Zipper, however, also named as defendants the members of the Collins Groups and their corporation, Orthopedics Association of Kansas City, Inc., Health Midwest and Dr. Kuhn and Richard Brown in their capacities as directors of Health Midwest. Whether Dr. Zipper adduced sufficient evidence to hold any of these defendants liable is, thus, examined.

Dr. Zipper's tortious interference claim against defendants Dr. Kuhn and Mr. Brown is first examined. To counter Dr. Zipper's allegation that Dr. Kuhn and Mr. Brown tortiously interfered with a legitimate business expectancy in their capacities as directors of Health Midwest, Dr. Kuhn and Mr. Brown filed affidavits averring that they acted only in their capacity as Board members of MCI when participating in MCI's consideration and ultimate revocation of Dr. Zipper's medical staff privileges. Dr. Kuhn and Mr. Brown averred that they did not discuss Dr. Zipper outside of MCI's Board of Director deliberations and that Dr. Zipper was never a topic of discussion or vote at the Board of Directors meetings at Health Midwest. These facts were within Dr. Kuhn and Mr. Brown's knowledge and refute Dr. Zipper's claim that they, in their capacity as directors of Health Midwest, tortiously interfered with Dr. Zipper's legitimate business expectancy in his continued staff privileges at MCI. Dr. Zipper, therefore, was required to adduce evidence establishing Dr. Kuhn and Mr. Brown, in their capacity as directors of Health Midwest, tortiously interfered with his legitimate business expectancy in order to defeat summary judgment. Dr. Zipper, however, failed to adduce any evidence regarding Dr. Kuhn and Mr. Brown's actions as directors of Heath Midwest. In his response to their summary judgment motion, Dr. Zipper alleged only that Dr. Kuhn and Mr. Brown were "actively involved in the illegal peer review and wrongful revocation" of his medical staff privileges at MCI. Dr. Zipper's allegation, however, fails to set forth any specific facts showing an active involvement by either Dr. Kuhn or Mr. Brown. Because Dr. Zipper failed to refute the factual assertions presented by Dr. Kuhn and Mr. Brown that they were acting only in their capacity as directors of MCI, that fact is deemed admitted. *See Hillside Dev. Co. v. Fields,* 928 S.W.2d 886, 889 (Mo.App.1996) ("Facts set forth in support of a motion for

summary judgment are taken as true unless contradicted by the non-moving party"). In their capacity as directors of MCI, Dr. Kuhn and Mr. Brown cannot be held liable for tortious interference. *Century*, 905 S.W.2d at 114. The trial court, therefore, properly granted summary judgment in favor of Dr. Kuhn and Mr. Brown.

■ Dr. Zipper's tortious interference claim against defendant Health Midwest is next examined. Health Midwest alleged in its motion for summary judgment that Dr. Zipper's staff privileges were never discussed at any Board Meeting at Health Midwest and that Health Midwest had no connection with the revocation of Dr. Zipper's staff privileges at MCI. In response to Health Midwest's assertion, Dr. Zipper alleged that "the entity, Health Midwest, joined and continued the conspiracy which began in 1989, described in detail in my petition." Dr. Zipper's petition, however, set forth no facts refuting Health Midwest's assertion that it never discussed or participated in the revocation of Dr. Zipper's staff privileges. Dr. Zipper also attached as Exhibit "D" to his response to Health Midwest's motion for summary judgment, an announcement of the Board of Directors of Research Hospital stating Research Hospital intended to merge with MCI to form the entity "Health Midwest." The fact that a merger between MCI and Research Hospital was proposed, however, does not support Dr. Zipper's assertion that Health Midwest participated in the alleged conspiracy to revoke his staff privileges at MCI. Because Dr. Zipper failed to present any facts refuting Health Midwest's assertion that it never discussed or participated in the revocation of Dr. Zipper's staff privileges, that fact is deemed admitted. *Hillside*, 928 S.W.2d at 889. The trial court, therefore, did not err in granting summary judgment in favor of Health Midwest.

■ Dr. Zipper's tortious interference claim against the members of the Collins Groups and their corporation, Orthopedics Association of Kansas City, Inc. is finally examined. Dr. Zipper alleged that Dr. Collins and Dr. West offered Dr. Zipper employment with the Collins group, which he refused. Dr. Collins thereafter became the chair of MCI's SEC. Dr. Zipper alleged that Dr. Collins then initiated a secretive peer review by the SEC and MEC of Dr. Zipper's surgical practices and his personal relationships with MCI's employees and staff. Dr. Zipper alleges that the secretive peer review was done with the sole purpose of eliminating him as a competitor and to make him an example to other doctors who considered undertaking an independent practice.

Dr. Zipper, however, failed to present any evidence supporting his tortious interference claim against defendants Dr. West and Dr. Dubin. Dr. Zipper did not present any evidence to support his allegation that Dr. West and Dr. Dubin were acting as agents of MCI or that they participated in MCI's decision to revoke Dr. Zipper's staff privileges. Similarly, Dr. Zipper failed to present evidence that Orthopedics Associates of Kansas City, Inc. participated in MCI's decision to revoke Dr. Zipper's staff privileges. While Dr. Zipper alleged that Orthopedics Associates of Kansas City, Inc. was a Missouri corporation owned and controlled by the Collins Group that engaged in the same medical speciality as Dr. Zipper, that fact alone is insufficient to support Dr. Zipper's claim that Orthopedics Associates of Kansas City, Inc. conspired with other individuals to eliminate Dr. Zipper as a competitor. The trial court, therefore, did not err in granting summary judgment in favor of Dr. West, Dr. Dubin and Orthopedics Associates of Kansas City, Inc.

■ Dr. Zipper's primary allegation against Dr. Collins was that he, as chairman of the SEC, initiated Dr. Zipper's peer review without Dr. Zipper's knowledge in an effort to eliminate Dr. Zipper as a competitor. Dr. Zipper stated in his affidavit that Dr. Collins initiated the peer review without Dr. Zipper's knowledge. Because Dr. Zipper admits that he lacked knowledge that Dr. Collins initiated the peer review, however, Dr. Zipper would be incompetent to testify to those activities. Dr. Zipper failed to produce other evidence supporting his claim and thus, failed to create an issue of material fact regarding Dr. Collins's involvement in the alleged conspiracy. Furthermore, because the evidence established that Dr. Collins was

chairman of MCI's SEC, Dr. Collins was acting as MCI's agent and, therefore, could not be held liable for tortious interference. *Century,* 905 S.W.2d at 114. The trial court did not err in granting summary judgment in favor of Dr. Collins. Point three is denied.

## CONCLUSION

The summary judgment of the trial court on Counts I, II, and IV is affirmed. The summary judgment of the trial court with respect to Count III is affirmed as to the MCI Board members and Mr. Kaseff, but is reversed as to MCI and MCP on the theory of unjust enrichment, and the case is remanded for further proceedings consistent with this opinion.

All concur.